ALLIED INDUSTRIAL WORKERS, AFL-CIO LOCAL UNION NO. 289, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Cavalier Division of Seeburg Corporation and Cavalier Corporation, Intervenor.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CAVALIER DIVISION OF SEEBURG CORPORATION and Cavalier Corporation, Respondent.

CAVALIER DIVISION OF SEEBURG CORPORATION and Cavalier Corporation, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 71-1775, 71-1999 and 71-2030.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1972.

Decided Jan. 12, 1973.

Reconsideration Denied Feb. 12, 1973.

Mr. George H. Cohen, New York City, with whom Messrs. John S. Williamson, Jr., New York City, and Kenneth R. Loebel were on the brief, for petitioners in No. 71–1775.

Mr. Steven R. Semler, Atty., N. L. R. B., with whom Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., was on the brief for petitioner in No. 71–1999 and respondent in Nos. 71–1775 and 71–2030.

Mr. Nathan Lewin, Washington, D. C., with whom Mr. Martin D. Minsker, Washington, D. C., was on the brief, for petitioners in. No. 71–2030, respondent in No. 71–1999 and intervenor in No. 71–1775.

Before TAMM, Circuit Judge, WADE H. McCREE, Jr.,* Circuit Judge (for the Sixth Circuit), and MacKINNON, Circuit Judge.

TAMM, Circuit Judge:

In this consolidated statutory review proceeding under the National Labor Relations Act,[1] the parties place in issue the Labor Board's finding[2] that Cavalier Division of Seeburg Corporation and Cavalier Corporation [hereinafter collectively "Employer" or "Company"][3] engaged in unfair labor practices in violation of § 8(a)(5), (3) and (1) of the Act, 29 U.S.C. § 158(a)(5), (3) and (1)

(1970), by withholding accrued vacation pay from employees during the course of a strike, by discharging several employees for alleged misconduct during the strike, by eventually refusing to bargain with Allied Industrial Workers, AFL–CIO Local Union No. 289 [hereinafter "Local 289" or "Union"] and supply certain requested information to the Union, and by unreasonably delaying the reinstatement of strikers following their unconditional offer to return to work after the strike. Moreover, the parties challenge the Board's finding as to the date that the strike was converted from an economic strike into an unfair labor practice strike. Having carefully considered the arguments advanced by the parties, with one modification indicated below we grant the Board's application for enforcement of its order.

## I. *Facts*

The Company and Local 289 had a bargaining relationship commencing with the Union's first certification in 1955. Successive collective-bargaining agreements ensued, the most recent of which expired on July 13, 1969. A series of unfruitful bargaining sessions then transpired, culminating in a union membership vote to strike.[4] The strike, economic in origin, began on July 21, 1969, and was destined to last until February of the following year. Several incidents which occurred during and immediately after the strike are the subject of this appeal.

### A. *Withholding Vacation Pay*

On May 1, 1969, the Company posted a notice stating that employee vacations would be taken during the first two

---

* Sitting by designation pursuant to 28 U.S. C. § 291(a) (1970).

1. 29 U.S.C. § 151 et seq. (1970).

2. The decision and order of the three-member panel of the National Labor Relations Board, empanelled pursuant to § 3(b) of the National Labor Relations Act, 29 U.S.C. § 153(b) (1970), is reported at 192 N.L.R.B. No. 37 (1970).

3. During the course of the proceedings before the Labor Board, Cavalier Division

of Seeburg Corporation ceased to exist and Cavalier Corporation, which had previously been a sales branch, assumed its obligations and operations. There is no issue raised as to successorship and for purposes of this appeal they are treated as one and the same party.

4. Both parties concede that the impediment to negotiations was a combination of the Company's recent financial problems and the effect of inflation on the employees' real wages.

weeks in August.[5] The notice was posted pursuant to the terms of the collective-bargaining agreement, which further provided that employees would be entitled to vacation pay each year in lieu of an actual vacation. While the Company maintained some discretion under the agreement in setting the precise dates, the vacation period was required to fall between June 15 and September 1. By letter to the Union dated July 28, 1969—one week after the strike began—the Company indicated that it had decided to delay commencement of vacations because of intervening events over which it had no control. The letter stated that the Union would be notified when a new decision concerning the vacation schedule had been reached. At the next bargaining session, held on or about July 31, the Union raised the topic of vacation pay. A Company representative stated that the letter spoke for itself, that no vacation could be rescheduled until after the strike, and that the matter of vacation pay would have to be decided later. The Union pressed the issue at the next bargaining session, held on August 5, asserting that the Company had a legal obligation to give the employees their vacation pay. The response was that "[t]he Company is not legally obligated to subsidize the strike." Finally, on August 11, the Union president and a group of employees confronted Company officials with the same demand, to which the Company president responded "we are not going to pay the vacation pay until the strike is over." The controversy remained unabated, the Company refusing vacation pay to both working and striking employees until October 30, at which time the sums were paid.

### B. Suspension and Discharge of Employees

Between the August 5 session and November 12 there was a bargaining hiatus. During that period several incidents occurred involving employees Fletcher, Brewer, Snyder, Tarpley, Creek and Rollins.

Some union members who previously had reported to strike returned to work. Among them was George Smith. Smith and several other nonstriking employees formed a car pool for the purpose of transportation to and from work. On the afternoon of September 23, as they were leaving the plant in Smith's car and with Smith driving, they were followed for some time by a car containing Union president Fred Fletcher and two striking employees, Vernon Brewer and Edward Snyder. No threatening gestures, horn blowing or interference of any kind occurred between the groups. Ultimately, Smith pulled into the driveway of a parking lot opposite the home of one of the occupants of his car. Fletcher followed suit, stopping his car about thirty or forty feet away. Nothing transpired for about half a minute, at which point the doors of Smith's car were abruptly opened and the occupants rushed to the front seat. It appeared to Fletcher that someone was sick in Smith's car. Fletcher then started his car and drove off, unaware that the driver of the other car had died of a heart attack. On September 25, Fletcher, Brewer and Snyder were notified by letter from the Company that they were suspended pending investigation for misconduct. Ultimately, on August 10, 1970, the latter two individuals were discharged on the ground of misconduct during the strike.[6]

Whether by design or coincidence, more than the usual number of pickets appeared to picket on the morning of November 3, 1969. By the time nonstriking employees began to report to work, conditions had deteriorated considerably. Stones were thrown, obscenities and invectives uttered, and threat-

---

5. The Company's practice was apparently to close down the entire plant for the two-week vacation period so that all employees, save a skeleton maintenance crew, would be on vacation at the same time.

6. With regard to employee Fletcher, *see* note 19, *infra*.

ening gestures made by the strikers. At issue is the alleged misconduct of two picketing employees, Lora Creek and Barbara Tarpley. On the morning in question Tarpley and Creek shouted obscenities at people entering the plant and, on one occasion, yelled to an employee that they would "get" her. One of the two individuals also threw down a picket sign at or near an automobile entering the plant. In addition, they occasionally joined hands on the sidewalk, thereby forcing employees to walk around them in order to enter the plant. Tarpley and Creek continued to strike and picket until the strike ended, at which point they requested reinstatement and unconditionally expressed their desire to return to work. The Company failed to respond in any manner until September 2, 1970, at which point the two individuals were informed by separate letters that they were discharged for misconduct during the strike.

Also discharged for allegedly participating in and leading a secondary boycott, by letter dated February 13, 1970, in response to his application for reinstatement, was striker Leonard Rollins.[7] Toward the end of October, 1969, at about the same time the Company began hiring permanent replacements for striking employees, Rollins became involved with a local civil rights leader, Reverend H. H. Wright. On or about October 5, following a meeting between Rollins and Reverend Wright, the details of which are undisclosed, the latter addressed a regular meeting of the Union. He expressed concern to the attending members over the hiring of replacements, inferring that this was part of a conspiracy against laborers and poor people. At a November 18 press conference, Rollins and Reverend Wright jointly announced the formation of a coalition between the two allegedly victimized groups to help those who had been

"dismissed" by the Company. Rollins, while not mentioning the word "boycott," did draw attention to the fact that the Company's sole product was "coolers" for Coca-Cola and that the "Coca-Cola industry" was its sole buyer.[8] Reverend Wright supplemented that statement by urging the public to buy no more Coca-Cola.

Several marches directed at convincing the public not to buy Coca-Cola were subsequently organized by the Reverend Wright and participated in by Rollins. One such march directly involved a customer of the Company, and during that episode the marchers interfered with ingress and egress to the Coca-Cola Bottling Company in Chattanooga. Finally, a handbill was distributed from the Union hall which found its way into the streets of Chattanooga urging the public to support the strike by refraining from purchasing Coca-Cola. The handbill could not be attributed to the leadership of the Union or to any other individual. Rollins, a rank and file member of the Union, participated in such activities without the sanction of the Union. Indeed, the International president of the Union specifically ordered the officers of the Union not to participate in boycott activities, an order which they heeded, and it was never established that the Union itself was directly involved in such activities.

C. *Refusal by the Company to Bargain and Events that Followed*

The parties met in bargaining sessions on August 5 and again on November 12, 1969. On December 2, the Union requested by letter to the Company that further bargaining ensue. The Company replied by letter on December 4:

[P]lease be advised that we must at this time defer your request for further bargaining pending disposition by the National Labor Relations

---

7. While Rollins was a past president of Local 289 and was still considered to be a leader by many union members, he apparently no longer held any union office.

8. In fact the Company engaged in the manufacture of soft drink vending machines which are purchased by the various Coca-Cola bottling companies throughout the United States.

Board of the petition which has been filed, apparently raising a question concerning representation. When this matter has been resolved, we shall act accordingly.[9]

The Company's board chairman testified to several additional factors influencing his decision to terminate bargaining although these were apparently not communicated to the Union at that time. First, he testified that 357 individuals were reporting to work, compared to 307 remaining strikers (some of whom had apparently found employment elsewhere). Second, he testified to personal knowledge of "overwhelming sentiment" among the working employees to no longer be represented by the Union, although no evidence as to the identity of those expressing such sentiment or their number was proffered.

On February 7, 1970, the Union notified the Company that the strike was ended and by letter requested reinstatement on behalf of all striking employees, indicating their willingness to return to work immediately and unconditionally. The Union also requested on that day that the Company supply it with certain information regarding employees who were presently filling production and nonproduction jobs, all job openings as of February 7, and other related matters. The Company responded to both requests on February 10, acknowledging termination of the strike but refusing to furnish the information because "We can perceive no legal duty to grant your request at this time," and refusing to reinstate striking employees on the ground that more information was needed. Specifically, the Company indicated its belief that some striking employees had obtained work elsewhere, others had moved out of the area, and still others did not desire to return to work, thereby raising questions concerning the Company's reinstatement responsibilities. The Company then requested that the Union

furnish it with a list of previous strikers who had not made application for reinstatement individually or who desired to preserve their rights with the Company. The letter concluded by stating:

If we do not receive such a list within a reasonable time, we will assume that none other than those who have made individual application desire to preserve such rights as they may have at Cavalier.

By letter dated February 18, 1970, the Company informed the employees who had been on strike that they must notify the Company individually of their willingness to return to work in order to be reinstated. Thereafter some employees who complied with this request were reinstated. The Union renewed its request of February 7 by letter dated February 27, and the Company replied on March 2 that such an "unconditional offer to return to work on behalf of striking employees is quite obviously too broad and inaccurate to be relied upon."

## II. *Conclusions by the NLRB*

To this point we have outlined the findings of the Trial Examiner which are of a purely factual nature and which were adopted by the Board. 192 N.L.R.B. No. 37 (1970). Not only are these findings supported by substantial evidence on the record as a whole, 29 U.S.C. § 160(e) and (f) (1970) and Administrative Procedure Act § 10(e), 5 U.S.C. §§ 701 and 706 (1970), but they are essentially uncontested by the parties for purposes of this appeal. We proceed now to consideration of whether the conclusions of law by the Board are warranted by the evidence. In agreement with the Trial Examiner, the Board found that the Company violated § 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1970), by refusing to bargain with the Company and furnish it with informa-

9. The letter refers to a petition for decertification filed by some dissident union members which raised certain questions concerning representation. The petition was immediately suspended pending the outcome of the present proceedings before the NLRB.

tion.[10] It also found that refusal to pay accrued vacation pay was a violation of § 8(a)(3) and (1) of the Act as was the discharge of employees Fletcher, Brewer, Snyder, Creek and Tarpley.[11] Contrary to the Trial Examiner, the Board found no violation by the Company in suspending employees Fletcher, Brewer and Snyder pending investigation of the incident in question, but it did find a violation of § 8(a)(3) and (1) in the discharge of Rollins, the alleged participant in a secondary boycott. Finally, the Board and Trial Examiner were in agreement that the Company further violated § 8(a)(3) and (1) by unreasonably delaying the reinstatement of unfair labor practice strikers following their unconditional offer to return to work on February 7, 1970. The Board, however, modified the Trial Examiner's finding that the strike was converted to an unfair labor practice strike on July 29, 1969, substituting therefor December 4, 1969. The Board entered an order requiring certain affirmative and negative acts by the Company directed at effectuating its holding.[12]

III. *Conclusions*

A. *Withholding Vacation Pay*

■■■ The Company's challenge to the Board's finding that it violated § 8(a)(3) and (1) of the Act is really twofold, and we shall consider those arguments in order. It first contends that the vacation pay had not accrued prior to its payment on October 30 and that its refusal to pay therefore cannot serve as a basis for violation of the Act. The 1966 contract provided, as did its predecessors, for one or two weeks of vacation pay to employees who had completed at least one or five years of continuous service, respectively.[13] The relevant portions of the agreement follow:

A first-year employee will receive his vacation pay upon completion of his 12 months of continuous service or at the vacation period, whichever comes last. His vacation pay thereafter will be issued to him at the time his vacation is taken, or on the first pay period in July if no vacation is scheduled for that year.

. . . . . .

The vacation period will be set by the Company to fall between June

---

10. 29 U.S.C. § 158(a) (1970) provides in relevant part:
 (a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 . . . . .

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

11. 29 U.S.C. § 158(a)(3) (1971) provides in relevant part:
 (a) It shall be an unfair labor practice for an employer—

 . . . . .

 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

12. Most significantly, the Company was ordered to cease and desist from those activities which were held to be viola-

tions and to offer reinstatement to the six discharged employees at the same or substantially equivalent positions with certain rights to back pay; to do the same for all employees who were on strike after December 4, 1969, on whose behalf an unconditional request for reinstatement was made by the Union; to make such employees whole for any loss of earnings suffered from February 12, 1970; and, upon request, to bargain collectively with Local 289 as the exclusive bargaining representative of the employees and make available to it certain information.

13. The relevant clause is as follows:
 Article 9, Section 1. An employee will be entitled to 1 week of vacation pay each year upon completion of 1 year of continuous service and 2 weeks of vacation pay for each year upon completion of 5 years of continuous service provided he has worked 1040 hours in the twelve-month period prior to the vacation date and is in the Company's employ at the time the vacation period begins.

15th and September 1st. Unless business reasons dictate a specific period the preference of the employees will be followed in choosing the vacation dates.

The dates chosen will be announced not later than May 1st.

Vacations are not cumulative and must be taken, or paid for, during each calendar year.

It is beyond dispute that vacation pay would accrue and become due and payable in lieu of actual vacation. The question presented is whether it accrued prior to October 30, the date when the sums were finally paid, thereby rendering the Company's refusal to pay after successive Union demands potentially violative of § 8(a)(3) and (1). Under any one of several interpretations the answer is indisputably yes, although for reasons which will become apparent it is unnecessary for us to determine the precise date.[14] The contract unequivocally limits the dates within which the vacation period must fall—between June 15 and September 1. Thus, once September 1 passed there can be no doubt that the amounts were due and payable. Moreover, since the vacation period of two weeks must *fall* rather than *begin* between those dates, the deadline must be considered to fall sometime in mid-August. Finally, we feel it is likely that the pay accrued at an even earlier date. The Company had no authority to reschedule vacations after the May 1 deadline specified in the contract. When it unilaterally made the decision to do so on about July 28 it was in the midst of an economic strike that may well have been anticipated to last well beyond mid-August. The letter itself arguably may have indicated the Company's awareness that a vacation could not be scheduled within the time limits prescribed in the collective-bargaining agreement. Thus, the employees' rights to vacation pay in lieu of actual vacation did accrue prior to October 30.[15]

The Company next urges that proof of antiunion motive is essential to a violation and that it did not harbor such a motive. The Trial Examiner found that the Company's action of withholding accrued vacation pay had, indeed, been motivated by antiunion purposes. The Labor Board, while not in disagreement with this finding, held that it was unnecessary to reach the issue of motive in light of NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L. Ed.2d 1027 (1967). We feel that clarification is merited. In *Great Dane Trailers,* the respondent company, faced with an economic strike, refused to pay accrued vacation pay to striking employees while announcing its intention to award such benefits to working employees (which it did). A hearing before a trial examiner resulted in a finding that the company's action constituted discrimination in the terms and conditions of employment which would discourage union membership as well as unlawfully interfere with a protected activity, thereby violating § 8(a)(3) and (1). The Labor Board adopted the conclusions but was reversed by the Court of Appeals on the ground that the company may have had any of a number of legitimate business purposes for such conduct. In the process of reversing and remanding with directions to enforce the Board's order, the Supreme Court clarified the appro-

14. *See also* § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1970); and NLRB v. C & C Plywood Corp., 385 U.S. 421, 427, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).

15. The Company asserts as authority for its interpretation of the clauses in question a 1962 strike of 5 weeks duration wherein the Company rescheduled vacations. Not only was that situation dissimilar from the present one in several respects, but we also feel it is of little value since the terms of the 1966 contract are clear and unequivocal in this respect and since we do not consider one dissimilar situation occurring seven years prior to this dispute to establish "past practice." The further argument that the Union somehow acquiesced in this interpretation prospectively by failing to bring an unfair labor practice charge in 1962 is devoid of any merit.

priate considerations for evaluating an alleged violation of § 8(a)(3):

> [S]everal principles of controlling importance here can be distilled. First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct.

388 U.S. at 34, 87 S.Ct. at 1798. The Company mistakenly argues that since the conduct must be "discriminatory" before it can be "inherently destructive," and since the Company refused to pay accrued vacation benefits nondiscriminatorily to all its employees, then the "comparatively slight" test enunciated in *Great Dane Trailers* must be applied. The Company then sets forth what it considers to be a "substantial business justification" for its conduct and contends that the Union has failed to successfully refute this evidence with proof of antiunion animus.

The Company misconstrues § 8(a)(3). That section requires "discrimination" as a prerequisite to a violation whether the conduct be "inherently

destructive" or "comparatively slight," a point which is absolutely clear in *Great Dane Trailers*. Not only does the requirement of discrimination not afford a basis for distinguishing between the two standards, but it also fails to afford a basis for arguing that § 8(a)(3) is inapplicable to the facts of this case. The Company argues that all cases relied upon by the NLRB for authority involve a course of conduct which discriminates between strikers and nonstrikers, citing, *inter alia*, Flambeau Plastics Corp. v. NLRB, 401 F.2d 128, 135 (7th Cir. 1969), cert. denied, 393 U.S. 1019, 89 S.Ct. 625, 21 L.Ed.2d 563 (1969), and NLRB v. Frick Co., 397 F.2d 956, 961–963 (3d Cir. 1968). It then argues that it did not "discriminate" since it was completely impartial between strikers and nonstrikers. While we agree that the courts above were concerned with unequal treatment of strikers and nonstrikers, we do not consider that to be dispositive. A practice applied uniformly to all employees may be discriminatory and violate the Act just as a discriminatory practice may be held to be perfectly innocuous. *Compare* American Ship Building Co. v. NLRB, 380 U.S. 300, 312–313, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) *and* United Steelworkers v. NLRB, 405 F.2d 1373 (D.C.Cir.1968) *with* NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).[16] Conduct by an employer which discourages a union activity protected by § 7 may also discourage and discriminate against membership in a labor organization.[17]

---

16. *See also* Wonder State Manufacturing Co. v. NLRB, 331 F.2d 737, 738 (6th Cir. 1964); Majestic Molded Products, Inc. v. NLRB, 330 F.2d 603, 606 (2d Cir. 1964); NLRB v. Frick Co., 397 F.2d 956, 962–963 (3d Cir. 1968); and Texaco, Inc., 179 N.L.R.B. 989, 993 (1969). *See generally* Christensen and Svanoe, Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality, 77 Yale L.J. 1269 (1968).

17. Here, when the vacation pay demands were first made and refused, virtually all of the plant personnel were out in support of the strike and no serious effort was made to keep the plant in operation. The refusal to pay, as found by the Trial Examiner and not refuted by the Board, was discriminatorily motivated. The fact that it was ultimately paid and paid to both strikers and nonstrikers does not remove the discriminatory taint—it was paid at a time when, according to the testimony of the Company, more individuals were working than striking and the plant was substantially operational once again. At that point the Company

■■■ In the present case the Employer conditioned payment of accrued vacation compensation upon cessation of a union-instigated economic strike. It is unnecessary for us to tread the uneasy path between "inherently destructive" and "comparatively slight" discrimination since the Company failed to prove a substantial business justification for its conduct.[18] *See Great Dane Trailers, supra, and* NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967). The Company introduced uncontradicted evidence illustrating financial problems which had recently befallen it. However, no testimony was introduced suggesting that the Company was unable to meet the financial burden of the vacation debt. In its simplist form the Company really argues that both sides anticipated economic hardship during the strike and that it was more appropriate for the Union than for the Company to absorb the loss of vacation funds even though the employees were lawfully entitled to them.

### B. *Suspension and Discharge of Employees*

With respect to employees Fletcher,[19] Brewer and Snyder, the Trial Examiner found that their purpose in following the automobile driven by Smith was to harass and coerce the riders in that car not to report to work, although he found no acts of physical interference whatsoever between the two vehicles. While the death of Smith was indeed unfortunate, an expert witness was totally unable to attribute it to the car following incident. The Trial Examiner noted that the Company had previously engaged in an unfair labor practice during the course of the strike by its refusal to pay accrued vacation pay, an action which "had an adverse effect . . . not only upon the outcome of the strike and the morale of the strikers, but against the very pocketbooks of the strikers themselves." Applying the doctrine established in Local 833, UAW v. NLRB, 112 U.S.App.D.C. 107, 300 F.2d 699 (1962), cert. denied, 382 U.S. 836, 86 S.Ct. 82, 15 L.Ed.2d 79 (1965), and NLRB v. Thayer Co., 213 F.2d 748 (1st Cir. 1954), cert. denied, 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694 (1954), he found that the Company had violated § 8(a)(3) and (1). The Board agreed, stating that such conduct, protected by § 7, "while not to be condoned, was not so egregious as to render them unfit for further employment, and that their dis-

was obviously less concerned with the strikers than with satisfying and retaining the services of former strikers.

18. Indeed, even if the Company had succeeded in such an assertion it would still be held to have violated § 8(a)(3) and (1) on the basis of the Trial Examiner's conclusion, unrefuted by the Board's holding and supported by substantial evidence on the record as a whole, that the Company possessed the requisite antiunion motive to overcome a showing of substantial business justification. Moreover, even were we to accept the Company's logic and find no "discrimination" within the meaning of § 8(a)(3), the Trial Examiner's findings with respect to motive would support an independent violation of § 8(a)(1). *See, e. g.,* NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964).

19. Actually, Fletcher was discharged by letter dated April 14, 1970, for certain picture-taking activities on the picket line.

This, of course, makes it quite impossible for him to have been discharged again on August 10, 1970, for participation in the car following incident, absent an intervening reinstatement. The Board, affirming the Trial Examiner, held that the initial discharge of Fletcher was violative of § 8(a)(3) and (1) of the Act since it was not the type of conduct which warrants refusal to reinstate, a conclusion which is not challenged in this appeal. The Company does contend, however, that had it not suspended Fletcher for the picture-taking activities, it would have suspended him for the car following activities. We are not permitted to review hypothetical issues and hence are forced to limit our holding to the discharge of Brewer and Snyder, although we do note that absent circumstances which distinguish Fletcher's conduct from that of the former two individuals, we cannot comprehend how such a discharge could be considered to be innocuous.

charge after the strike was therefore violative of Section 8(a)(3) and (1).''

A similar conclusion was reached with respect to employees Creek and Tarpley, who had shouted obscenities and engaged in other misconduct on the picket line.

> [N]ot every incident occurring on the picket line, though harmful to a totally innocent employer, justifies refusal to reemploy a picketing employee for acts that exceed the bounds of routine picketing. Impulsive behavior on the picket line is to be expected especially when directed against nonstriking employees or strike breakers.

Montgomery Ward & Co. v. NLRB, 374 F.2d 606, 608 (10th Cir. 1967). *See also* Terry Coach Industries, Inc., 166 N.L.R.B. 560 (1967), enforced, 411 F.2d 612 (9th Cir. 1969); NLRB v. Buitoni Food Corp., 298 F.2d 169 (3d Cir. 1962); NLRB v. Efco Manufacturing, Inc., 227 F.2d 675 (1st Cir. 1955), cert. denied, 350 U.S. 1007, 76 S.Ct. 651, 100 L.Ed. 869 (1955); Stewart Hog Ring Co., Inc., 131 N.L.R.B. 310 (1961); Hartmann Luggage Co., 183 N.L.R.B. No. 128 (1970), enforced as modified, 453 F.2d 178 (6th Cir. 1971); and Schott v. Metal Products Co., 128 N.L.R.B. 415 (1960). Finally, while the Trial Examiner found that employee Rollins did engage in a leadership role in conduct that ultimately extended the strike beyond the domain of his immediate employer to one entity doing business with the employer, he held that this was not a boycott within the meaning of § 8(b)(4)(i)(ii)(A) and (B) of the Act. Nevertheless he found that Rollins' discharge was for cause, a conclusion which the Board rejected:

> In all the circumstances, we find that Rollins' conduct . . . while not to be condoned, was not so egregious as to render Rollins unfit for further employment . . . .

While it is true that the Board offers little support for its conclusion, we note that not present here are any remarks

or materials disparaging the quality of products of the employer which might bring the case within the rationale of NLRB v. Local 1229, IBEW, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953). Nor was the handbill distributed at Union headquarters attributed to Rollins. Furthermore, the record fails to show whether any of the vending machines manufactured by the Company after the strike began were used by the Chattanooga Coca-Cola Bottling Company, nor does it show whether Rollins participated in the only march which directly involved a bottling plant.[20]

Clearly some types of impulsive behavior must have been within the contemplation of Congress when it provided for the right to strike. *See* NLRB v. Wichita Television Corp., Inc., 277 F.2d 579, 585 (10th Cir. 1960), cert. denied, 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 93 (1960); NLRB v. Thor Power Tool Co., 351 F.2d 584, 587 (7th Cir. 1965). It is not unusual to become involved, as we are today, in balancing the employees' right to organize and bargain collectively against the employer's right to maintain order and respect and the public's right to safety. *See, e. g.,* Local 833, UAW, *supra,* 300 F.2d at 703 n. 10 and NLRB v. Thor Power Tool Co., *supra,* 351 F.2d at 58. This involves consideration of such opaque factors, many of which depend upon a sifting of conflicting testimony in an attempt to envision the totality of circumstances, as whether the misconduct "is so violent or of such serious character as to render the employee unfit for further service," NLRB v. Illinois Tool Works, 153 F.2d 811, 816 (7th Cir. 1946); whether such misconduct constitutes "a trivial rough incident" or occurs in "a moment of animal exuberance," Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U.S. 287, 293, 61 S.Ct. 552, 85 L.Ed. 836 (1941); whether the employer's unlawful acts were serious or provocative, Local 833, UAW, *supra,* 300 F.2d at 703; and whether reinstatement would effectuate

20. Rollins denied participation in that march.

the policies of the Act, *id.* at 703. As the court in NLRB v. Thor Power Tool Co., *supra,* 351 F.2d at 587, aptly summarized:

> Initially, the responsibility to draw the line between these conflicting rights rests with the Board, and its determination, unless illogical or arbitrary, ought not be disturbed.

We find that the Labor Board's conclusions in these matters were neither arbitrary nor illogical and, with one exception, decline to comment further.

■ The one particularly troublesome matter involves the suspension two days after the car following incident of employees Fletcher, Snyder and Brewer "pending investigation for misconduct." While the suspension letter indicated no specific reason for such action, the Company concedes that it was largely meant "to advise the Company's other employees . . . that misconduct resulting in death would not be tolerated . . . . " [21] The fact that the resulting death was apparently the primary reason for suspension leads us directly to the case of NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). In *Burnup & Sims* it was incorrectly brought to the employer's attention that two employees who were attempting to organize the respondent company's plant had threatened to dynamite the plant if they did not receive collective bargaining authorization. They were forthwith discharged. After finding that the employees were engaged in an activity protected by § 7, the Court held:

> Over and again the Board has ruled that § 8(a)(1) is violated if an employee is discharged for misconduct arising out of a protected activity, despite the employer's good faith, when it is shown that the misconduct never occurred. . . .
>
> That rule seems to us to be in conformity with the policy behind § 8(a)(1). Otherwise the protected activity would lose some of its immunity, since the example of employees who are discharged on false charges would or might have a deterrent effect on other employees.

379 U.S. at 23, 85 S.Ct. at 172. Here the employees in question were alleged to have engaged in what may be characterized as *two* types of misconduct: First, merely following the Smith automobile; second, and more seriously, engaging in activity which "result[ed] in death." It was for the latter reason that they were suspended, yet it later became clear that Smith's death could not be attributed to these employees. As in *Burnup & Sims* the Company had acted under a good faith mistake of fact, and that case therefore controls.

The Company urges us to distinguish *Burnup & Sims* on the ground that the employees there, unlike here, were engaged in activities protected by § 7. *Compare* NLRB v. Laney & Duke Storage Warehouse Co., 369 F.2d 859, 865–866 (5th Cir. 1966) *with* NLRB v. Big Three Welding Equipment Co., 359 F.2d 77, 84 (5th Cir. 1966). While some confusion is understandable in light of the Board's order, its conclusion is nevertheless deducible and contrary to the Company's contention. The trial examiner apparently concluded that the three employees were not engaged in protected activity, a finding which was rejected by the Board. Although the Board addressed only the issue of whether § 8(a)(3) and (1) had been violated by the *discharge* of the employees when it held that the discharge was "in contravention of their rights under Section 7," it could not in the next breath consistently conclude that the employees were disassociated from § 7 rights for purposes of the *suspension.* Having concluded that Fletcher, Brewer and Snyder were not disassociated from § 7 activities during the car following incident, we find the outcome to be controlled by the rational espoused in *Burnup & Sims* —*i. e.* the suspension of the three em-

---

21. Brief for Cavalier Division of Seeburg Corp., and Cavalier Corp. at 36.

ployees pending investigation was a violation of § 8(a)(1) of the Act.

We similarly reject the argument that the present case is distinguishable from *Burnup & Sims* in that the Board here found that the employees *were* engaged in misconduct, but not misconduct so egregious as to render them unfit for further employment. While we do not hold that all misconduct insufficient for dismissal is prima facie insufficient for suspension under the *Burnup & Sims* rationale we do note that the only other "misconduct" in which the three participated was that of following an automobile at 30 to 40 feet with no attempt to interfere or communicate. Thus, even assuming that this was the "misconduct" for which they were suspended rather than the fact that an employee coincidentally met his death, we find it insufficient to merit suspension for cause.

## C. *Refusal of the Company to Bargain and Events that Followed*

The Company refused to comply with the Union's December 2 request for further bargaining, stating as grounds therefor that a decertification petition was then pending with the National Labor Relations Board. Indeed, such a petition had been filed by an unknown number of dissident employees on December 1, although it was immediately suspended by the Board pending the outcome of the unfair labor practice proceeding.

The Union was originally certified in 1955 and recertified in 1962 as well as by subsequent execution of a series of collective-bargaining agreements. After its first year of certification a rebuttable presumption of the union's majority status exists. Unless the employer can prove that the union in fact no longer enjoys a majority, it can only overcome the presumption upon a showing of "sufficient evidence to cast serious doubt on the union's continued majority status." Stoner Rubber Co., Inc., 123 N.L.R.B. 1440, 1445 (1959). The pertinent standard has been inter-

preted to require both a reasonable basis in fact for the doubt and good faith by the employer. *See, e. g.,* Lodges 1746 and 743, IMW v. NLRB, 135 U.S.App. D.C. 53, 416 F.2d 809, 812 (1969), cert. denied, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1969); NLRB v. Frick Co., 423 F.2d 1327, 1330 (3d Cir. 1970). The naked showing that a decertification petition has been filed, with no indication of the number of signatories or other related matters, is an insufficient basis in fact for refusing to bargain since it establishes no more than that the petition was supported by the requisite 30% "showing of interest." Wabana, Inc., 146 N.L.R.B. 1162, 1171 (1964). In the present case the Employer attempted to bolster this evidence by testifying that on December 4, the date on which it refused to bargain, more persons were crossing the picket line to work than were striking. It has been held time and again, however, that an employee's return to work during a strike does not provide a reasonable basis for presuming that he has repudiated the union as his bargaining representative. *See, e. g.,* NLRB v. Easton Packing Co., 437 F.2d 811, 814 (3d Cir. 1971); NLRB v. Frick Co., *supra,* 423 F.2d at 1333–34; and NLRB v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091 (8th Cir. 1969). *Compare* Terrell Machine Co. v. NLRB, 427 F.2d 1088, 1090 (4th Cir. 1970), cert. denied, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970). Absent supporting evidence it may mean no more than that he was forced to return to work for financial reasons or that he did not support the strike in question. *See, e. g.,* NLRB v. Frick Co., *supra,* 423 F.2d at 1333. Finally, the Employer's testimony to the effect that he had personal knowledge of "overwhelming sentiment" against the Union, with no indication of the number or identity of workers expressing such views nor any other corroboration, is no more than a "self-serving assertion," NLRB v. Little Rock Downtowner, Inc., *supra,* 414 F.2d at 1091, which

adds nothing to the preceding evidence. While we must consider the totality of such evidence in determining whether the employer had a reasonably grounded good faith doubt as to the Union's majority status, we note that on two previous occasions within the course of the strike the Employer had engaged in unfair labor practices: First, by withholding accrued vacation pay; and second, by suspending employees Fletcher, Brewer and Snyder. As found by the Trial Examiner and supported by the evidence, these actions contributed to the loss of Union support and, when considered with the foregoing, preclude any possibility that the Company maintained a good faith doubt as to the Union's continued majority status. *See* NLRB v. A. W. Thompson, Inc., 449 F.2d 1333, 1336 (5th Cir. 1971), cert. denied, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972). We note additionally that refusal to furnish the Union with information essential to its bargaining obligation is yet another indication of bad faith. United Steelworkers v. NLRB, 132 U.S.App.D.C. 103, 405 F.2d 1373 (1968). We think the Board's conclusion that the Company violated § 8(a)(5) and (1) of the Act by refusing to bargain on and after December 4 is amply supported by the record.[22]

### D. *Conversion into an Unfair Labor Practice Strike*

 The Board found that by refusing to bargain with the Union on December 4, 1969, in violation of § 8(a)(5) and (1) of the Act the Employer prolonged the strike and consequently it converted as of that date into an unfair labor practice strike.[23] It is undisputed that the strike was economic in nature at its outset. The Union takes issue with the standard applied by the Board in determining which of several unfair labor practices converted the strike. The Union, relying upon an isolated passage from Teamsters Local 992 v. NLRB, 138 U.S.App.D.C. 312 427 F.2d 582 (1970), contends that a strike is converted if the unfair labor practice in question merely "aggravates" rather than "prolongs" it. The issue involved in *Teamsters Local 992* was whether substantial evidence supported the Board's finding that a unilateral decision by the employer to increase wages by fourteen cents per hour converted an economic strike into an unfair labor practice strike. While it is true that the court referred to "aggravate" and "prolong" disjunctively, reliance upon such usage is misplaced as the following passage indicates:

> "[W]here a strike which initially involved no unfair labor practice is prolonged or aggravated by an employer's unfair labor practice, the same rule applies as where the strike is the *result* of an unfair labor practice, and the employer is bound to reinstate all strikers . . . ."

Once it is shown that an employer's unfair labor practice is a significant factor in a strike, the burden is "on the Company to show that the strike would have continued even if it had [not committed its unfair labor practice]."

---

22. Having found that the Company was obligated to bargain with the Union, we similarly hold, in agreement with the Board and the Trial Examiner, that failure to furnish to the Union, upon request, information necessary to fulfill its bargaining obligation resulted in an additional violation of § 8(a)(5) and (1). *See* Kayser-Roth Hosiery Co., Inc., v. NLRB, 447 F.2d 396 (6th Cir. 1971).

23. The issue, of course, is of significance to the parties in that unfair labor practice strikers are entitled to reinstatement regardless of whether the employer has replaced them, Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956), while economic strikers are entitled to reinstatement only if they have not been permanently replaced, NLRB v. MacKay Co., 304 U.S. 333, 346, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

427 F.2d at 587. Thus, it is abundantly clear that the court in *Local 992* was concerned with the effect of such practices on the longevity of the strike and not merely with whether the unfair labor practices aggravated the strike. This is consistent with the great weight of authority.

> It has been uniformly ruled and is now well settled that to entitle employees to reinstatement because of unfair [labor] practice of the employer, after a strike has been declared, it must appear that the practice prolonged the strike; and this necessarily follows from the fact that only then can it be that any part of the unemployment for which reinstatement is the remedy has resulted from a violation of the Act.

NLRB v. James Thompson & Co., 208 F.2d 743, 749 (2d Cir. 1953) (footnote omitted). *Accord,* Electrical Workers Local 613 v. NLRB, 328 F.2d 723, 726 (3d Cir. 1964); Drivers Local 662 v. NLRB, 302 F.2d 908, 911 (D.C.Cir. 1962), cert. denied, 371 U.S. 827, 83 S. Ct. 48, 9 L.Ed.2d 65 (1962); NLRB v. Jackson Press, Inc., 201 F.2d 541, 546 (7th Cir. 1953). Having concluded that the Board applied the appropriate standard, we find the Board's determination that the strike was, in fact, prolonged by the refusal to bargain to be supported by substantial evidence on the record as a whole.[24] NLRB v. Frick Co., 397 F.2d 956, 964 (3d Cir. 1968). We therefore conclude that the order of the Board should be modified with regard to the suspension of employees Fletcher, Brewer and Snyder in accordance with this opinion, and so modified we grant the Board's application for enforcement of its order.

---

24. The Board, affirming the Trial Examiner, also found that the employer violated § 8(a)(3) and (1) by repeatedly refusing to accept the Union's unconditional offer on behalf of its employees to return to work, but instead insisting upon information to which it had no legal right. We affirm for reasons clearly set out in our recent decision of Retail Store Union v. NLRB, 466 F.2d 380, 385 (D.C.Cir. 1972).