**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HARTMANN LUGGAGE COMPANY, Respondent.**

**No. 71–1047.**

United States Court of Appeals, Sixth Circuit.

Dec. 29, 1971.

---

Judith P. Wilkenfeld, N. L. R. B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert E. Williams, Atty., N. L. R. B., Washington, D. C., on brief.

George B. Smith, Atlanta, Ga., for respondent; Fred W. Elarbree, Jr., Robert L. Thompson, Atlanta, Ga. (of counsel), Constangy & Prowell, on brief.

Before PECK, McCREE, and BROOKS, Circuit Judges.

McCREE, Circuit Judge.

We consider an application for enforcement of an order of the National Labor Relations Board which requires the reinstatement with back pay of nine of ten former strikers. The first issue requires us to determine whether, after a strike has ended, a company must reinstate economic strikers if subsequent job openings result from resignations of workers who replaced them.

Respondent contends that the striking employees lost their status as employees entitled to preferential treatment as soon as they were replaced. It also contends that they ceased to be employees one year after the beginning of the strike even if they did not lose their preferred status immediately when they were replaced. Respondent further contends that four of the nine employees did not unconditionally apply for reinstatement, and that seven of them engaged in conduct serious enough to justify the refusal to reinstate them.

The Board, in a decision and order reported at 183 N.L.R.B. No. 128 (1970), ruled that nine employees were entitled to reinstatement and ordered the Company to take appropriate affirmative action and to cease and desist from further similar violations of sections 8(a) (1) and (3) of the Act, 29 U.S.C. §§ 158(a) (1), (3).[1] We enforce the Board's order, except that part of it which directs the reinstatement of Pauline Jordan and Guila Byers whose conduct justified respondent's refusal to reinstate them.

Teamsters Local 327[2] was certified as the bargaining agent for the company's production and maintenance employees at its Lebanon, Tennessee, plant in July 1967. An economic strike began on January 23, 1968, and picketing continued until March 1969, when the strike ended. Two earlier cases which arose from this dispute resulted in findings that the Company had not committed unfair labor practices, 173 N.L.R.B. No. 193 (1968), and that the Union had violated

---

1. 29 U.S.C. §§ 158(a) (1) and (3) provide:
   (a) It shall be an unfair labor practice for an employer—
      (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

   .    .    .    .    .

      (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to' encourage or discourage membership in any labor organization.

2. Teamsters, Chauffeurs, Helpers and Taxicab Drivers, Local Union 327, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

§ 8(b) (1) (A) of the Act, 29 U.S.C. § 158(b) (1) (A), because it was responsible for some unlawfully coercive conduct of the strikers. 173 N.L.R.B. No. 220 (1968), *enforced as modified*, 419 F.2d 1282 (6th Cir. 1970).

During the course of the strike, the Company attempted to maintain operations by replacing striking employees. Nevertheless, its work force declined from 129 employees to approximately 76, where it remained until the time of this enforcement proceeding. The conduct of the strike was marked by numerous acts of minor violence, mass picketing, threats, and obstruction of plant entrances and exits.

During the 3½ month period following the strike, 13 employees left the Company for various reasons and vacated jobs which the charging parties were qualified to perform. Each of the nine strikers whom the Board ordered reinstated attempted a timely application for reinstatement. However, the Company denied any obligation to employ them.

We begin, as the Supreme Court did in NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed. 2d 614 (1967), by observing that striking workers remain "employees" entitled to the protection of national labor laws:

> Section 2(3) of the Act (61 Stat. 137, 29 U.S.C. § 152(3)) provides that an individual whose work has ceased as a consequence of a labor dispute continues to be an employee if he has not obtained regular and substantially equivalent employment. If, after conclusion of the strike, the employer refuses to reinstate striking employees, the effect is to discourage employees from exercising their rights to organize and to strike guaranteed by §§ 7 and 13 of the Act (61 Stat. 140 and 151, 29 U.S.C. §§ 157 and 163). Under §§ 8(a) (1) and (3) (29 U.S.C. §§ 158(1) and (3)) it is an unfair labor practice to interfere with the exercise of these rights. Accordingly, unless the employer who refuses to reinstate strikers can show that his action was due to "legitimate and substantial business justifications," he is guilty of an unfair labor practice. NLRB v. Great Dane Trailers, 388 U. S. 26, 34 [87 S.Ct. 1792, 1798, 18 L. Ed.2d 1027] (1967). The burden of proving justification is on the employer. *Ibid*. It is the primary responsibility of the Board and not of the courts "to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." *Id.*, at 33–34 [87 S.Ct., at 1797]. See also NLRB v. Erie Resistor Corp., 373 U.S. 221, 228–229, 235–236 [83 S. Ct. 1139, 1145, 1149, 10 L.Ed.2d 308] (1963). Universal Camera Corp. v. NLRB, 340 U.S. 474 [71 S.Ct. 456, 95 L.Ed. 456] (1951), is not an invitation to disregard this rule. [Footnote omitted.]

389 U.S. at 378, 88 S.Ct. at 545. Also, it is well settled that an employer may refuse to reinstate employees whose positions are occupied by replacements hired on a permanent basis during the strike. NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). But employers are obligated to reinstate applying strikers as production returns to pre-strike levels and positions become available. *Fleetwood Trailer Co., supra.* Respondent contends that we should distinguish between positions made available by expanding production and those made available by resignations. We do not consider the distinction to be of controlling significance.

Following the Supreme Court's decision in *Fleetwood Trailer Co., supra*, the Board, in The Laidlaw Corp., 171 N.L.R.B. No. 175 (1968), held that, under these circumstances, strikers are entitled to reinstatement unless the employer can establish that his refusal to reinstate was for legitimate and substantial business reasons. The Board's order in that case was enforced in Laidlaw Corp. v. NLRB, 414 F.2d 99 (7th Cir.) (rehearing denied September 2, 1969), cert. denied, 397 U.S. 920, 90 S.

Ct. 928, 25 L.Ed.2d 100 (1970). Subsequently, two additional circuits have agreed that the Board's position is correct. American Machinery Corp. v. NLRB, 424 F.2d 1321 (5th Cir. 1970); NLRB v. Johnson Sheet Metal, Inc., 442 F.2d 1056 (10th Cir. 1971) (rehearing denied June 17, 1971). We also agree.

■ Respondent's next contention is that economic strikers lose their status as employees 12 months after the beginning of the strike. Respondent would interpret § 9(c) (3) of the Act, 29 U.S. C. § 159(c) (3), as a limitation of the employee status of economic strikers under § 2(3), 29 U.S.C. § 152(3).[3] The 1959 amendment of § 9(c) (3) gave replaced economic strikers the right to vote in elections held during the 12 months following the commencement of the strike. Under the Labor Management Relations Act of 1947 no striking employee could vote unless he was entitled to reinstatement. Accordingly, the 1959 amendment gave some economic strikers a right they did not previously possess. See NLRB v. Erie Resistor Corp., 373 U.S. 221, 233–34 n. 12, 83 S. Ct. 1139, 10 L.Ed.2d 308 (1963). We are aware of no authority which indicates that this grant of additional rights should be read as a limitation of the strikers' status as employees under a different section of the Act.

Respondent argues that a strict time limit, such as that imposed upon the right to vote under § 9(c) (3), should be placed upon strikers' status as employees under § 2(3). Otherwise, it would be unreasonably onerous to require employers to keep records for an indefinite time of strikers who might apply for reinstatement after a strike had ended.

We see no reason, however, why that consideration cannot be among those to be weighed by the Board in determining whether, in a particular case, the employer has a legitimate business reason substantial enough to outweigh the employee's right to be reinstated. As the court stated in American Machinery Corp. v. NLRB, 424 F.2d 1321, 1328 (5th Cir. 1970),

> [W]hile the resolution is ultimately for the Board subject to limited judicial review under the Act, a concerned employer will find means to cope with this burden. For example, he might notify the strikers when they request reinstatement of a reasonable time during which their applications will be considered current and at the expiration of which they must take affirmative action to maintain that current status. A reasonable rule would not contravene *Fleetwood's* assertion that "[t]he right to reinstatement does not depend upon technicalities relating to application."

We further observe that the strike and picketing continued for longer than one year in this case. The absolute rule respondent suggests would therefore sharply curtail the right to strike. In this case, openings occurred from one to four months after the picketing ceased; and all strikers who then applied for reinstatement would have been automatically barred. Accordingly, we determine that the nine employees were eligible to apply for reinstatement.

■ Respondent contends that four of the employees did not make sufficient application for reinstatement. The situations of Gertie Lee Farmer and Vallie Brewington are similar and we consider

---

3. 29 U.S.C. § 159(c) (3) provides:
   (3) . . . Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this subchapter in any election conducted within twelve months after the commencement of the strike. . . .
   29 U.S.C. § 152(3) provides:

(3) The term "employee" . . . shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment. . . .

them together. Both completed application forms at the Company's plant and, on April 10, 1969, each spoke to the Company's Director of Manufacturing, Donald V. Cady. Cady expressed surprise that they would apply for reinstatement under the circumstances. As the Trial Examiner found:

> Cady emphasized to Mrs. Brewington the distinct probability that she would be subjected to physical violence if she were to return to work and gave her no assurances that Respondent would afford her necessary protection.

The Trial Examiner found that Cady . . . told Farmer he did not understand what "you ladies" were doing putting in applications, and questioned why they wanted to work for the Company or why they would be satisfied after all that had happened. Cady further stated that a lot of people in the plant felt "mighty strongly" toward "some of you."

The Trial Examiner therefore concluded, and the Board agreed, that the subsequent withdrawal of their applications was coerced by these remarks. That determination is supported by substantial evidence on the record considered as a whole, and we sustain it.

■ Lillie Bradley applied to the Company for her old job as a "trimmer" on March 15, 1969. When she was informed that there was no available position, she requested a termination slip which would enable her to obtain alternative employment if she could find it. The Board did not adopt the Trial Examiner's recommended conclusion that the limited nature of her application and her request for a termination slip gave the Company reason to believe she was abandoning her request for reinstatement. It concluded:

> Mrs. Bradley had hopefully sought employment when she believed that a trimmer job had become vacant. Her subsequent request for a separation slip was prefaced by a clear indication that she had a need and desire to re-

turn to work. Having no other employment in hand, it makes no sense to say that an employee would under such circumstances cut herself off from any chance to return to work to a job in which she may have accumulated seniority or other beneficial rights. . . . [W]e are of the opinion that the Respondent has not sustained the burden of showing a legitimate business justification for failing to recall Mrs. Bradley when jobs became available.

This determination is supported by the record. *See* NLRB v. Valley Die Cast Corp., 303 F.2d 64, 66 (6th Cir. 1962). As the Supreme Court stated in *Fleetwood Trailer Co., supra*, 389 U.S. at 381, 88 S.Ct. at 547, "[t]he right to reinstatement does not depend upon technicalities relating to application. On the contrary, the status of the striker as an employee continues until he has obtained 'other regular and substantially equivalent employment.' (29 U.S.C. § 152 (3).)"

■ Dorothy Fisher attempted at least twice to apply for reinstatement. She was first informed by Cady's secretary that he was too busy to see her and was later informed that he wasn't taking applications that day. The latter incident occurred on the day on which Cady coerced Mrs. Farmer and Mrs. Brewington into withdrawing their applications. Respondent's assertion that notice to Cady's secretary was not adequate notice to the Company requires no discussion. *See* NLRB v. Valley Die Cast Corp., *supra*.

The final argument relied upon by the Company in refusing reinstatement is that seven of the applicants engaged in misconduct during the strike serious enough to justify the refusal. Again we begin by observing the standards applicable to review of the decision of the Board:

> [N]ot every impropriety committed during [section 7] activity places the employee beyond the protective shield of the act. The employee's right to

engage in concerted activity may permit some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect. [Citation omitted.] Initially, the responsibility to draw the line between these conflicting rights rests with the Board, and its determination, unless illogical or arbitrary, ought not be disturbed.

NLRB v. Thor Power Tool Co., 351 F.2d 584, 587 (7th Cir. 1965). See Montgomery Ward & Co. v. NLRB, 374 F.2d 606, 608 (10th Cir. 1967); NLRB v. Cambria Clay Products Co., 215 F.2d 48, 54 (6th Cir. 1954), rehearing denied, 229 F.2d 433 (1955); Republic Steel Corp. v. NLRB, 107 F.2d 472, 479 (3d Cir. 1939), modified, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940). With these principles in mind, we regard only three of the Board's determinations as subject to serious challenge. In each case the Board ordered the employee reinstated contrary to the recommendation of the Trial Examiner.

The only incident of misconduct attributed to Lorene Taylor occurred on January 29, 1968, when, as the Trial Examiner found, she threatened a supervisor who was entering the plant. The Trial Examiner credited the supervisor's testimony:

> According to Supervisors Martha Fleming and Greely Ricketts, while riding to the plant in Ricketts' car on January 29 they were blocked from entering the plant premises by a large body of pickets. While halted Mrs. Taylor stepped up to the car and told Ricketts that they (meaning the strikers) were mad at him. He said he was sorry. Mrs. Taylor said they were mad and were going to stay mad. Ricketts said he was sorry to lose friends. Mrs. Taylor said it would be a shame for them to have to kill him (or they hated to kill him) because he was too young to die but it seemed like they were going to be forced to do so.

The Trial Examiner found that Pauline Jordan on three occasions directed vulgar offensive remarks to non-striking employees. On one occasion, she was a part of a group of pickets who prevented a truck first from entering and then from leaving the plant for periods of about seven minutes until the police arrived. On another occasion, she was among a group of pickets who slowed the exit of a car occupied by Company officers. On April 4, 1968, a rock thrown by another picketer struck the automobile of a departing employee, Louise Gaston. When Mrs. Gaston stopped to see whether her vehicle had been damaged, a group of picketers, including Mrs. Jordan, ran toward her shouting that they were going to "get" her. On the same occasion, Mrs. Jordan struck the side of an automobile with a picket sign as it entered the plant premises.

The Trial Examiner found that Guila Byers was part of the group who chased and threatened Mrs. Gaston. She also attempted to block the passage of an automobile entering the plant on the first day of the strike, and, on one occasion, spread nails under a departing automobile and caused a flat tire.

The Board ordered reinstatement of all three of these employees. In discussing the conduct relied upon by the Trial Examiner in recommending that Taylor, Jordan, Byers, and one other employee be denied reinstatement, the Board stated:

> An examination of the various acts attributed to the four aforementioned discriminatees reveals that they fell into the following general classifications: scattered instances of obscene statements and name calling, isolated threats of personal injury, some of them not directly attributable to the alleged discriminatees, their presence in a group in which property damage or yelling occurred, violation of a state court injunction, mass picketing which briefly blocked ingress and egress, and two minor incidents of property damage.

As the Supreme Court stated in *Fleetwood Trailer Co., supra,* 389 U.S. at 378, 88 S.Ct. at 546, "[i]t is the primary responsibility of the Board and not of the

courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.' " Nevertheless, an employer is not required to countenance all misconduct, and we believe some of the acts complained of here are beyond the pale of section 7. Similar behavior in the past has been held to justify an employer's refusal to reinstate strikers. *E. g.,* W. J. Ruscoe Co. v. NLRB, 406 F.2d 725 (6th Cir. 1969) (mass picketing preventing ingress and egress at plant gates, pushing and rocking of an occupied automobile, throwing gravel); NLRB v. Mt. Clemens Pottery Co., 147 F.2d 262, 267–268 (6th Cir. 1945) (assault and battery).

We have examined the testimony of the threat made by Mrs. Taylor. It appears that it was made under circumstances which make it incredible that she intended it literally, and we regard it as picket line rhetoric. It is not contended that she committed acts of vandalism or violence. Accordingly, we sustain the Board's determination that the threats did not disqualify Taylor from reinstatement.

However, we regard the conduct of Mrs. Jordan and Mrs. Byers as more serious. Mrs. Byers' act of damaging the departing automobile might easily have led to more serious consequences than a mere flat tire. Similarly, Mrs. Jordan's striking of a passing automobile not only was a serious act of misconduct, but also might easily have incited her companions to further violence or have led to physical retaliation. We regard this conduct as sufficient justification for an employer not found by the Board to have been in violation of the Act to refuse reinstatement of economic strikers.

The Board's order will be enforced except with respect to Mrs. Jordan and Mrs. Byers.

Enforcement granted in part and denied in part.