The **ROGERS MANUFACTURING COMPANY**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent.

No. 72-2103.

United States Court of Appeals, Sixth Circuit.

Argued June 8, 1973.

Decided Oct. 24, 1973.

Edward C. Kaminski, Buckingham, Doolittle & Burroughs and Herndon & Bartlo, Akron, Ohio, for petitioner.

Russell H. Gardner, N. L. R. B., for respondent; John D. Burgoyne, Atty., Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Asst. Gen. Counsel, N. L. R. B., on brief.

Before WEICK, EDWARDS and PECK, Circuit Judges.

JOHN W. PECK, Circuit Judge.

Petitioner Rogers Manufacturing Company (hereinafter Company) pursuant to Section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f), filed this petition for review and vacation of an order of the National Labor Relations Board (hereinafter Board) finding violations by the Company of Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act. The Board has filed a cross-application for enforcement of its order, which is reported at 197 NLRB 180.

The pertinent facts are as follows. In February of 1969, a local union of the United Auto Workers was certified as bargaining representative of the petitioner's production and maintenance employees at its Akron, Ohio, plant. Negotiations for a first contract began the following April but failed and in June of 1969 the Union called a strike. The period of the strike was marked with incidents of violence as the Company continued to operate with non-striking and replacement employees. After a short period, however, the Union decided to abandon the strike if it could secure reinstatement of the striking employees. In August of 1969, the Company informed the Union that the reinstated strikers would not be given credit for their previously accrued seniority. The Union thereupon rejected the Company's conditional reinstatement offer considering the offer a demand for "superseniority"[1] for the replacements, and filed charges with the Board in May and June of 1970 respecting, inter alia, the reinstatement condition. Subsequently a settlement was reached providing that the Company agreed to bargain with the Union and would not grant superseniority to replacement employees.

Negotiations then resumed until October 15, 1970, when during a bargaining session a company spokesman announced that a petition seeking decertification of the Union had been filed with the Board by several employees. The spokesman raised the question as to whether it would be an unfair labor practice for the certified union and the company to continue to negotiate and arrive at a contract under the circumstances. After a colloquy in which the chief company spokesman repeated his concern that the continued negotiations would violate the Act, the chief union spokesman asserted, "You are refusing to meet with us." The company spokesman replied, "No, we are not refusing to meet with you, there is danger of violating the law," and the union spokesman replied, "If that is the situation, there is no point in having any further meetings." A month later when the petition was ultimately dismissed by the Board, negotiations resumed. In March of 1971, the Union "unconditionally returned to work" and asked for reinstatement of the strikers. The Company took no action toward the reinstatement until April when the employees were notified that they were to report for interviews at which time they were allegedly advised that they would be treated, for seniority purposes, as new employees pending a Board ruling on the matter. All twenty-six strikers seeking reinstatement were offered jobs but for sixteen the jobs were a step down to more hazardous work. Only one of the sixteen accepted. In June of 1971, the Union terminated the strike and renewed its offer to return to work. Although the Company immediately offered reinstatement, the Company's relatively short deadline for a response was not met and the offer was not renewed.

The Board, in affirming the findings of the Trial Examiner, found that the Company improperly suspended negotiations while the decertification petition was pending; that it delayed offers of reinstatement until April of 1971; that

---

1. The effect of the Company's offer would be that the strikers, upon their return to work, would find their seniority rights subordinated to those of the replacements so that in the event of a subsequent layoff the strikers would be dismissed before any of the replacements and the replacements would be the first to be recalled. In other words, the replacements would have "superseniority."

it improperly cancelled the strikers' seniority; that post-settlement unfair labor practices warranted setting aside the August, 1970 settlement agreement; that the Company improperly insisted upon superseniority; that in December of 1969 the insistence upon superseniority became a cause of or prolonged the strike; and that the Company's failure to offer reinstatement in March of 1971 to the strikers of their former or substantially equivalent jobs was a violation of the Act. The Board's order, inter alia, requires reinstatement and reimbursement of lost pay for the twenty-six strikers.

The Board found that the suspension of negotiations in 1970 was attributable to the Company and that this conduct, together with the Company's delay in reinstating and granting to the strikers their pre-strike rights, justified setting aside the settlement agreement. The suspension of negotiations was viewed as a direct breach of the settlement agreement and the other actions were seen as substantial independent and unfair labor practices. We conclude that there is substantial evidence on the record as a whole to support the Board's findings.

We turn to the issue arising out of the Company's suspension of negotiations. This Court has recently held that under some circumstances an employer may be warranted in refusing to bargain with a union about whose majority he has a good faith doubt, see N. L. R. B. v. Dayton Motels, Inc., 474 F.2d 328, 331–332 (6th Cir. 1973), but the mere filing of a decertification petition is of itself insufficient justification. Cf. Allied Industrial Workers, AFL–CIO Local Union No. 289 v. N. L. R. B., 476 F.2d 868, 881 (D.C.Cir. 1973). Rather, evidence indicating that a good faith doubt was reasonably grounded must be advanced. Contrary to the Company's argument, however, the fact that certain employees did not support the strike or that replacement employees were hired is insufficient evidence that the employees have repudiat-

ed the union as its bargaining representative. See, Allied Industrial Workers, AFL–CIO Local Union No. 289 v. N. L. R. B., *supra*. As a matter of fact, the Company's engagement in unfair labor practices during the strike, such as are hereinafter discussed, the demand for superseniority, casts a shadow on allegations of good faith. We agree with the Board that the Company has not met its burden in this respect.

In addition, it is well settled that "an employer must bargain with a union for a reasonable period without regard to its majority status where the bargaining relationship arose as a result of a settlement agreement." N. L. R. B. v. Universal Gear Service Corp., 394 F. 2d 396, 398 (6th Cir. 1968). Therefore, even assuming that the Company had a good faith doubt as to the Union's majority at the time the decertification petition was filed, the Company plainly obligated itself in the August settlement agreement to bargain with the Union but broke off negotiations two months later. Under these circumstances, we conclude that the Board properly found that the Company's suspension of negotiations in October of 1970 was violative of Section 8(a)(5) and (1) of the Act.

As regards the Board's findings that the Company violated Section 8(a)(3) of the Act by delaying its offers of reinstatement to the strikers until April of 1971 and by cancelling the strikers' seniority, the Company maintains that the strikers were not entitled to either reinstatement offers or back pay while they continued their strike.

The record indicates that the Union made an unconditional offer to abandon the strike and return to work, effective March 1, 1971. However, it was more than a month later when the Company responded to the applications for reinstatement. The law is settled that economic strikers are entitled to their former positions upon their unconditional application for reinstatement, absent some legitimate and substantial business justification. And the burden

of proving such justification is on the employer who denies or delays reinstatement. N. L. R. B. v. Hartmann Luggage Co., 453 F.2d 178, 181 (6th Cir. 1971), citing N. L. R. B. v. Fleetwood Trailer Co., 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967). The record reveals that only assembly room work was not then available and testimony from the Company works manager acknowledges "some vacancies in the press and press operators." We conclude that the Company has failed to detail sufficient and legitimate business justifications for the delay and that there is sufficient evidence to support the finding of the Board.

■■■■ The returning strikers were advised by the Company that they were to be treated as new employees until such time as the Board ruled otherwise, but the law is clear that returning strikers are entitled to receive all their former rights and privileges, including seniority. N. L. R. B. v. Robinson, 251 F. 2d 639, 641–642 (6th Cir. 1958). The record contains considerable support for a finding of violation of this standard, as the Board found.

■■■ The Company also argues that the complaint herein did not allege discrimination against the strikers as economic strikers but only as unfair labor practice strikers. We are satisfied that any variance was not prejudicial. Evidence on this point was introduced without objection and the Company had adequate notice of the matters in issue. As quoted with approval in Rea Trucking Co. v. N. L. R. B., 439 F.2d 1065, 1066 (9th Cir. 1971), " 'The Board . . . has an obligation to decide material issues which have been fairly tried by the parties even though they have not been specifically pleaded.' [citations omitted]." Compare, N. L. R. B. v. Johnson, 322 F.2d 216, 219–220 (6th Cir. 1963), cert. denied, 376 U.S. 951, 84 S.Ct. 968, 11 L.Ed.2d 971.

■■■ It is of course recognized that the Board may not consider matters properly disposed by a settlement agreement "unless there is a breach of the agreement or a subsequent independent violation of the Act by the parties to the agreement." Lincoln Bearing Co. v. N. L. R. B., 311 F.2d 48, 50 (6th Cir. 1962). See, also, N. L. R. B. v. Superior Tool & Die Co., 309 F.2d 692, 695 (6th Cir. 1962). We conclude that certain illegal pre-settlement conduct by the Company indicates that unfair labor practices were committed after execution of the settlement agreement and that such acts justified setting aside the agreement. We further conclude that it was proper for the Board to consider, as it did, whether the Company's pre-settlement unfair labor practices converted the existing economic strike into an unfair labor practice strike even though the original charges made no specific allegation to that effect. N. L. R. B. v. Lasko Metal Products, Inc., 363 F.2d 529 (6th Cir. 1966). In particular, in this case it is clear that the Company was timely informed by a consolidated complaint that such an issue would be raised.

As to the actual activities, the record establishes that after the strike had been conducted for a short period, the Union sought to abandon it and concentrated on securing the reinstatement of the strikers. However, beginning in August of 1969, the Company demanded superseniority for the replacements as the price for reinstating the strikers. As noted by the Trial Examiner, Section 10(b) of the Act, 29 U.S.C. § 160(b), prohibits the Board from basing any finding of a violation of the Act on an event occurring more than six months before service upon the company of the charge filed with the Board. Since service was not effected until May 15, 1970, the applicable cut-off date was November 15, 1969. The first meeting subsequent to this date at which superseniority was demanded was December 3, 1969. Therefore, as found by the Trial Examiner and affirmed by the Board, December 3 is the earliest date on which the Company may be found to have violated the Act by its insistence

on superseniority and on which the strike may be found to have been prolonged because of such insistence.

Turning to the issue of superseniority, it is settled that insisting upon superseniority for strike replacements constitutes a refusal to bargain in violation of Section 8(a)(5) and (1) of the Act. N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 230–237, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); Philip Carey Manufacturing Co. v. N. L. R. B., 331 F.2d 720, 726–729 (6th Cir. 1964), cert. denied, 379 U.S. 888, 85 S.Ct. 159, 13 L. Ed.2d 92. As the Company concedes in its brief, "[T]here is substantial evidence to support a finding that [the Company] proposed superseniority for strike replacements some time in 1969." Likewise, we conclude that there is substantial evidence to demonstrate that from August of 1969 through May of 1970, after which the settlement agreement was reached, the Company adhered to this demand and that such insistence interfered with the reaching of an accord on reinstatement of the strikers. Indeed, such evidence substantially supports the Trial Examiner's conclusion, affirmed by the Board, that the Company's pre-settlement insistence on superseniority for nonstriking and replacement employees from December 3, 1969, violated Section 8(a)(5) and (1) of the Act.

It is clear also that the Board had a substantial basis for inferring that the Company's unlawful insistence on superseniority prolonged the strike and thus on December 3, 1969, converted the existing economic strike into an unfair labor practice strike. The fact that unresolved contractual issues may have remained is not crucial since a single area of disagreement (in this case the demand for superseniority) need not be the sole cause for failure to agree. Philip Carey Manufacturing Co. v. N. L. R. B., *supra,* 331 F.2d at 728; United Steelworkers of America, AFL–CIO, Local 5571 v. N. L. R. B., 130 U.S.App.D.C. 369, 401 F.2d 434, 437 (1968), cert. denied, 395 U.S. 946, 89 S.Ct. 2020, 23 L.

Ed.2d 465. We find substantial evidence on the record that the Company's position on superseniority was consistent until execution of the settlement agreement and contributed to the prolongation of the strike.

In addition, following the conversion of the strike to an unfair labor practice strike, the strikers were entitled to unconditional reinstatement to any of their former jobs for which no replacements had been hired prior to the date of the conversion, N. L. R. B. v. International Van Lines, 409 U.S. 48, 50–51, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972), and the reinstatement should have been to the same job (or its substantial equivalent) held by the striker prior to the strike. G. P. D., Inc. v. N. L. R. B., 406 F.2d 26, 32 (6th Cir. 1969). The Trial Examiner found, and the record supports the findings, that sixteen strikers were offered less desirable and more hazardous work than they previously performed prior to the strike. The record also reveals that the Company had hired thirteen replacements in the area in which sixteen workers formerly worked, i. e., the assembly area, subsequent to the date of the strike conversion, December 3, 1969. Consequently, those strikers who were regularly employed in the assembly area before the strike should have been offered reinstatement to the thirteen positions. It is noted that the Trial Examiner unexplainably ordered that fourteen strikers were entitled to reinstatement in the assembly area. We leave to compliance proceedings the question of which striker may not be entitled to reinstatement.

One other matter requires our attention. The Company charges that the Trial Examiner unlawfully made over 170 changes to the transcript, some of which have allegedly altered the testimony to a substantial degree. The multitude of the changes highlights the irregularity and we approach it with considerable caution. We first acknowledge a trial judge's sua sponte power to correct the record in accordance with his memory. N. L. R. B. v. W. B.

Jones Lumber Co., 245 F.2d 388, 392 (9th Cir. 1957). See also, 7 Moore's Federal Practice § 75.08 [1] (1972). We also note the Trial Examiner's explanation that the changes were "based not only on his recollection of his own remarks, as well as those of the witnesses and counsel, but also on extensive notes taken by him at the hearing, and the context in which the questioned items appear." Principally, the Company objects to the addition of the words "without superseniority" to a witness's testimony, thereby materially altering what had been recorded as the testimony. We are satisfied from a review of the record that the modification of the testimony is corroborated by testimony by the same witness to the same effect in two other places in the transcript, neither of which are challenged by the Company. Finally, in this regard, we are convinced that the record supports the Board's finding that the Company insisted upon superseniority.

All other contentions of the Company we conclude to be without merit. The Board's order is affirmed and enforcement is granted.