**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BINGHAM–WILLAMETTE COMPANY, Respondent.**

No. 87–7130.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1988.

Decided Sept. 20, 1988.

**662**

Peter Winkloer, N.L.R.B., Washington, D.C., for petitioner.

Lester V. Smith, Jr., Bullard, Korshoj, Smith & Jernstedt, P.C., Portland, Or., for respondent.

Before HUG, FLETCHER and NELSON, Circuit Judges.

FLETCHER, Circuit Judge:

The National Labor Relations Board petitions this court for enforcement of an order entered against Bingham–Willamette Company to reinstate three employees and to cease and desist from continuing a layoff policy that discriminates against former strikers. We grant the NLRB's petition for enforcement.

## BACKGROUND

At the end of March 1983, the labor contract between Bingham–Willamette Co. (BW) and the Metal Trades Council (the union representing BW's employees) ex- pired. Negotiations to renew the contract broke down in April, and the union went on strike. During the strike, BW continued operations using employees who did not support the strike or who left the picket lines. On May 24, 1983, after negotiations reached an impasse, BW unilaterally implemented its contract offer, which contained the layoff provision from the previous contract. Under this provision, employees were to be selected for layoffs solely on the basis of seniority. In June 1983, BW began hiring permanent replacement workers, who were assured that they would not be replaced as a result of any settlement with the strikers.

Contract negotiations resumed, and, after further negotiations without agreement being reached,[1] BW implemented a proposal on September 22 which reduced wages and holidays, changed health benefits, increased management discretion over work assignment, and changed the method of selecting employees for layoffs. The latter proposal, entitled "Layoff and Recall," provided that layoffs would be determined based on BW's evaluation of the employees' "skill and ability," and that seniority would be the determining factor when skill and ability of the employees were equal. Further, seniority would be determined from the date of the employee's most recent break in employment, including strikes.

The strike ended in April 1984, and in July 1984, the employees voted the union out in a Board-conducted decertification election. From April 1984 to July 1986, BW laid off 113 employees, 34 of whom supported the strike for the duration. The present dispute concerns the April 1986 layoffs of three employees in the quality control department who had been reinstated after the strike. It is undisputed that the three would not have been laid off if they had not participated in the strike to its end.

The new union for the aggrieved employees, Boilermakers Local No. 72, filed an

---

1. The General Counsel contends that the parties had not bargained to impasse, in the technical sense.

unfair labor practice charge, and the NLRB office of the General Counsel issued a complaint on May 30, 1986. A hearing was held before an ALJ, who issued an opinion finding BW in violation of § 8(a)(1) & (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (3). The ALJ found that the parties had not bargained to impasse on the new layoff proposal, so that BW's unilateral implementation of it was unlawful; and that, even if impasse had been reached, the layoff proposal discriminated against strikers without substantial and legitimate business justification. The ALJ ordered BW to reinstate the employees and to cease and desist from "[d]enying its reinstated striking employees their full seniority rights." The NLRB affirmed, adopting the ALJ's findings, conclusions and order. However, the Board "[found] it unnecessary to rely on [the ALJ's] finding that the parties did not bargain to impasse."

## DISCUSSION

The Board's findings should be upheld if they are supported by substantial evidence in the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). We review de novo whether the Board applied the correct legal standard. *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 182 (1971).

### I. *Impasse over the Layoff Policy*

 BW argues that it was entitled to implement the challenged layoff and recall policy as a matter of law, because the parties had bargained to impasse over the proposal.[2] An employer unilaterally may implement a proposal concerning a mandatory subject of bargaining, under NLRA § 8(a)(5) & (d), 29 U.S.C. § 158(a)(5) & (d), only after the employer and the union bargain to impasse over the proposal. *NLRB*

---

**2.** Although the ALJ found that impasse had not been reached, the Board found it unnecessary to rely on that finding. We will assume, without deciding, that impasse had been reached.

**3.** BW's reliance on *Leveld Wholesale, Inc.,* 218 N.L.R.B. 1344, 89 L.R.R.M. 1889 (1975) is misplaced. *Leveld Wholesale* did not involve seniority preferences for replacements, but rather

*v. Auto Fast Freight,* 793 F.2d 1126, 1129 (9th Cir.1986). "Even after the collective bargaining agreement has expired, the employer is prohibited from taking unilateral action until the parties have bargained to impasse." *Id.* However, an employer cannot bargain to impasse over an "obviously intolerable" proposal. *See NLRB v. Yutana Barge Lines,* 315 F.2d 524, 528 (9th Cir.1963). A proposal to grant "superseniority" to replacements or workers who leave the picket lines to return to work has been held to be an unfair labor practice, *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). An employer's insistence on such a proposal constitutes a "refusal to bargain" in violation of § 8(a)(1) & (5). *Rogers Mfg. Co. v. NLRB,* 486 F.2d 644, 649 (6th Cir. 1973).

 Thus, BW was not entitled to implement the challenged layoff and recall policy if that policy was tantamount to superseniority. Superseniority, in its classic form, is the grant of seniority to replacement and non-striking workers. When the strikers returned to work, they would find their seniority rights subordinated to those of the replacements and non-strikers; in the event of layoffs, the strikers would be dismissed first. Unless a proposal obviously does not amount to superseniority, that issue appears to be a fact-bound determination left largely to the Board's expertise. *See Erie Resistor,* 373 U.S. at 227, 236, 83 S.Ct. at 1149-50. In this case, BW decided that it would not credit strikers with seniority accrued prior to the strike in selecting employees for layoffs. Because such a proposal has been identified as tantamount to "superseniority," *see Rogers Mfg. Co.,* 486 F.2d at 646 & n. 1, we cannot find, as a matter of law, that the challenged proposal could lawfully be implemented after impasse.[3]

---

a change in fringe benefits applied equally to strikers and replacements. 218 N.L.R.B. at 1350. In *Harrison Ready Mix,* 272 N.L.R.B. 47 (1984), *enf. den.,* 770 F.2d 78 (6th Cir.1985), also relied on by BW, the employees were drivers whose workload (and hence pay) was determined by their place on a list ranked by seniority. The Board did not suggest that the parties

## II. *Violation of § 8(a)(1) & (3)*

■ In *Erie Resistor*, where the employer broke the strike by offering 20 years superseniority to workers crossing the picket lines, the Court found the practice to be so inherently destructive of employee interests that it could be deemed a violation, despite proof of business justification and without proof of an underlying anti-union purpose. 373 U.S. at 227–28, 83 S.Ct. at 1144–45. In general, where the employer engages in discriminatory conduct "which could have adversely affected employee rights to *some* extent," the burden is on the employer to show some "legitimate and substantial" business justification for its action. *NLRB v. Great Dane Trailers*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1797–98, 18 L.Ed.2d 1027 (1967). If the employer makes such a showing, no unfair labor practice will be found unless the employer is proven to have had an anti-union motivation. *Id.*

■ Here, the Board found that BW's layoff policy adversely affected the employees' statutory right to strike and that BW had failed to show a substantial and legitimate business justification. The Board thus found it unnecessary to decide whether the challenged layoff policy was "inherently destructive" of employees' rights.

BW's new layoff policy unquestionably discriminated against strikers when it came to determining layoffs. Reinstated strikers were given no credit for seniority accrued before the strike. Although "skill and ability" was the first level criterion for determining layoffs, seniority (from date of last break in employment) could be and was relied upon in cases where skill and ability were considered equal. This finding by the Board was supported by substantial evidence—primarily, a comparison of treatment of the three employees in question with others of "equal skill and ability" in their department who did not remain on strike for the duration. Such "superseniority" discrimination adversely affects an employee's right to strike. *Erie Resistor*, 373 U.S. at 231, 83 S.Ct. at 1147; *Rogers Mfg. Co.*, 486 F.2d at 646 & n. 1.

■ BW does not seriously contest this conclusion. Instead, BW argues that it has shown a substantial and legitimate business justification for implementing the challenged layoff policy. According to BW, its policy was justified by the need to hire permanent replacements while, at the same time, protecting itself from liability under *Belknap, Inc. v. Hale*, 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983). In *Belknap*, an employer hired permanent replacements for its employees who were engaged in an economic strike.[4] Belknap assured the prospective replacements that they would not be discharged to make room for reinstated strikers as a result of any settlement. Subsequently, the union brought various unfair labor practice charges against Belknap, and a settlement was reached, in which Belknap agreed to reinstate the strikers. Several replacement workers laid off as a result sued in state

---

could have bargained to impasse on a superseniority issue. In any case, the Sixth Circuit overruled the Board. 770 F.2d at 78. The court found that three workers who left the picket line were not entitled to be put above replacement workers on the list because, under the unique circumstances of that industry where work was sporadic, doing so would be tantamount to discharging permanent replacement workers. Under *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938), an employer cannot be compelled to discharge permanent replacements to create room for returning strikers. 770 F.2d at 80–81; *see also Belknap, Inc. v. Hale*, 463 U.S. 491, 504 n. 8, 103 S.Ct. 3172, 3179–80 n. 8, 77 L.Ed.2d 798 (1983) (*Mackay* remains good law).

**4.** The court distinguished "economic" strikes from "unfair labor practice" strikes as follows:

The federal labor relations laws recognize both economic strikes and strikes to protest unfair labor practices. Where employees have engaged in an economic strike, the employer may hire permanent replacements whom it need not discharge even if the strikers offer to return to work unconditionally. If the work stoppage is an unfair labor practice strike, the employer must discharge any replacements in order to accommodate returning strikers.

*Belknap*, 463 U.S. at 493, 103 S.Ct. at 3174.

court for misrepresentation and breach of contract. The Court held that federal preemption doctrine did not protect the employer from the state suits. 463 U.S. at 500–01, 103 S.Ct. at 3177–78.

*Belknap* was decided on June 30, 1983, just after BW began hiring replacements to whom it was giving assurances similar to those in *Belknap*. BW contends that it implemented the new layoff policy to protect replacement workers from being displaced, thereby protecting itself from civil liability to laid off replacements. Whether this contention accurately summarizes BW's motivation, it is not a substantial and legitimate business justification. Under *Belknap* the employers could have avoided misrepresentations to the replacements by making the permanent offers "subject only to settlement with [the] employees' union and to a Board unfair labor practice order directing reinstatement of strikers." *Id.* at 503, 103 S.Ct. at 3179. Thus, the way to avoid liability under *Belknap* is to be frank with the replacements, not to offer them superseniority. Moreover, BW did not promise the replacements superseniority or guarantee them that they would never be laid off; if a replacement had been laid off on the basis of seniority, it is not clear that he would have had a misrepresentation claim even if he were never given a *"Belknap* warning."

In sum, substantial evidence supports the Board's finding that BW's layoff policy to some extent adversely affected the employees' right to strike and was not justified by a substantial and legitimate business purpose.[5]

ENFORCEMENT GRANTED.

---

**5.** It is thus unnecessary to decide whether BW acted with anti-union animus. *See Great Dane*

*Trailers,* 388 U.S. at 34, 87 S.Ct. at 1797–98.