NEW ALASKA DEVELOPMENT CORP.,
Alaska Housing Corporation,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 17930.

United States Court of Appeals,
Seventh Circuit.

March 9, 1971.

John T. Van Aken, Peter J. Hurtgen, Andrew M. Kramer, Chicago, Ill., for petitioner; Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., of counsel.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Ira Goldberg, John D. Burgoyne, Attys., N. L. R. B., Washington, D. C., for respondent.

Before MAJOR and HASTINGS, Senior Circuit Judges, and KILEY, Circuit Judge.

KILEY, Circuit Judge.

Petitioner New Alaska Development Corporation (Company) seeks to set aside a decision of the National Labor Relations Board (Board) finding violations of 8(a) (1) and 8(a) (5) of the National Labor Relations Act[1] and ordering the Company to, among other things, bargain with the Union.[2] The Board cross-petitions for enforcement of the orders. We deny the Company petition, retain jurisdiction, and remand for further proceedings.

The Company is a single integrated real estate enterprise engaged, so far as relevant here, in operation of three apartment buildings in or near

1. 29 U.S.C. § 151 et seq.

2. General Laborers Union, Local 341.

Anchorage, Alaska.[3] The Union began an organizational drive in July of 1966 among the Company's maintenance employees. On July 20 the Union made its first demand for recognition as employees' bargaining agent on the basis of a card majority of 14 of the 19 employees. The Company's response was a petition contesting Board jurisdiction, which the Regional Director denied.[4] Thereafter, on request of the Union, the Director reconsidered and reversed his decision and directed an election on October 31, 1967.

After issuance of the Director's order, the Union began its second drive and on October 13 made its second demand for recognition based on a card majority of 11 of the then 14 unit employees. The Company made no response. The election was held as directed and the Union lost 7 to 6.[5] The Union filed objections to the election. The pending unfair labor practice and the objections to the election were consolidated for hearing before the Trial Examiner.

■ The General Counsel's complaint charged 8(a)(1), (3) and (5) violations. The Examiner concluded that the Company had violated 8(a)(1) in interrogation and threats to employee Miller shortly after the Union's first demand of July 20, 1966; and that similar violations were committed as to employees Jackson, Kutas, Barton and Gibson shortly before the October 1967 demand. The Examiner concluded there was no 8(a)(3) violation with respect to employee Twitchell. On the basis of the October 1967 8(a)(1) violations, the Examiner concluded that the Company had violated 8(a)(5) in refusing to recognize the Union as bargaining agent upon its second demand.

The Examiner's conclusions were based upon findings which included determinations of credibility and we cannot say that his determinations were not warranted. The Board adopted the findings and conclusions of the Examiner. We think the record as a whole justified the Board's decision.

Within a few days after the Union made its first demand, Manager Evarts interrogated employee Miller about his signing of an authorization card and threatened that Union success might cause the employees to lose "some of the benefits that [they] at that time had," that there would "probably be a lot of new faces around here," and that "all of the maintenance work" might be subcontracted.[6]

In October, 1967, after the Union had begun its second organizational drive, employee Jackson, a woman, was summoned to Evarts' office, questioned in private, and told, "I know you, Alma, won't be against us." On October 31, 1967, the election directed by the Board was held. Early that morning Supervisor Atkins told employees Kutas, Barton and Gibson, "you guys better watch out because if you go union you will see what will happen," that the employees "didn't know what was going to happen, but he [Atkins] did, and he wasn't going to tell."

Each 8(a)(1) violation contributed to an anti-union pattern which gave color to each. L. C. Cassidy & Son, Inc. v. N. L. R. B., 415 F.2d 1358, 1361 (7th Cir. 1969). The statement made to Miller that "if the Union goes through, there will probably be a lot of new faces around here" could well be construed as "a threat of retaliation based on misrepresentation and coercion" and therefore

---

3. This court has jurisdiction under Section 10(e) and (f) of the Act, 29 U.S.C. § 160(e), (f), since its corporate headquarters are in Chicago, Illinois, and it transacts business in Chicago.

4. The Union then filed with the Board an unfair labor practice charge of violation of Sections 8(a) (1), (3) and (5) of the Act.

5. One vote was challenged.

6. Although the Examiner thought this 8(a)(1) violation with respect to Miller had no substantial impact on the second Union drive in view of the Union's achieving a card majority in October, 1967, it is relevant as to the atmosphere surrounding the alleged 1967 violations.

not protected speech under Section 8(c). *See* N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 618–620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1970). And the threats made the morning of election by Atkins, the only supervisor other than Evarts in contact with the employees, could be interpreted as not an expression of opinion but as a direct statement of facts to which he was privy. Atkins admitted at the hearing that he had discussed with Evarts the consequences of unionization and as a result thought that there would be changes in some of the working conditions and that some people would be replaced. The statement made to Jackson after being summoned to the manager's office, although admittedly "relatively inconsequential" if viewed "standing alone," could be construed as coercive in view of the other interrogations following the Union's organizational drive.

Accordingly, we conclude that each of the findings of violations of 8(a)(1) is supported by substantial evidence.

On the basis of the 8(a)(1) violations with respect to Jackson, Kutas, Barton and Gibson, the Examiner found that although the Jackson interrogation "seems relatively inconsequential" it "buttressed" the impact of the threats, on the morning of election, to the other three employees, which the Examiner thought "could have been the controlling circumstance" in the 7 to 6 vote in the election; and that the Company undertook this course to destroy the Union majority. The Examiner concluded that the misconduct "suggests" rejection of the collective bargaining principle and constituted a violation of Section 8(a)(5). We think the record as a whole gives substantial support to the findings and conclusions.

The Examiner applied the doctrine of Joy Silk Mills, Inc., 185 NLRB 1263, *enforced,* 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), *cert. denied,* 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951), in deciding that the Company's 8(a)(1) and (5) violations disclosed a lack of good faith in performing its duty to bar-

gain. He recommended that the election be set aside because those violations may have affected employees' freedom of choice in the election, and that a bargaining order was the proper remedy. The Board adopted the recommendations, and the bargaining order before us was issued April 30, 1969.

On October 23, 1969, the Board gave notice that it would reconsider its decision in the light of N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and gave leave to the parties to file statements of position concerning the 8(a) (5) violation and bargaining order. The Company responded with a Motion to Reopen the Record to include an affidavit showing the post-election turnover of New Alaska employees and statements taken from present employees to the effect that a reliable rerun of the election could be conducted.

On January 27, 1970, the Board, in a supplemental decision, reaffirmed its original determination that the Company had violated 8(a) (5) and that a bargaining order was necessary. This supplemental decision is subject of the principal issue before us.

■ The Company argues, on authority of N. L. R. B. v. American Cable Systems, Inc., 427 F.2d 446 (5th Cir. 1970), that the Board's supplemental order erroneously denied its Motion to Reopen the Record for proof of employee turnover since entry of the original Board decision, and proof of lack of knowledge of current employees of the supervisor's 1967 threats. We find no error in the Board's ruling.

This court prefers—over *American Cable*—the rule of N. L. R. B. v. L. B. Foster Co., 418 F.2d 1, 5 (9th Cir. 1969), that a bargaining order may be enforced "in spite of substantial changes in the situation occurring after the election." N. L. R. B. v. Kostel Corporation, 440 F.2d 347 (7th Cir. filed Feb. 25, 1971). *See* N. L. R. B. v. Drives, Inc., 440 F.2d 354 (7th Cir. filed Jan. 20, 1971). *See also* N. L. R. B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230

(1962). As we pointed out in *Kostel*, a remand for reconsideration on the basis of facts occurring after the Board's decision would place a premium upon protracted litigation and continuation of unlawful practices by the employer. If the bargaining order is valid and the current employees after a reasonable period desire, they may petition for a representative election. *See* N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 613, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Board did not err in denying the Company's Motion to Reopen the Record.

■ The Company also contends the bargaining order must be set aside under *Gissel* because the Board has not shown by analysis of the factual situation that "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight." 395 U.S. at 614, 89 S.Ct. at 1940.

The Board found the threats of such a nature as to preclude holding a "free and fair election," that the card majority was a more reliable test of employee desire and that the bargaining order was necessary to effectuate the policies of the National Labor Relations Act.

Clearly this does not meet the "precise analysis" required by *Gissel*. N. L. R. B. v. Kostel Corporation, *supra*.

So far as the record shows, neither the Examiner nor the Board panel took into consideration the "extensiveness" of the Company's election day threats and the impact of this unlawful practice upon the election; whether the practice might recur; whether there is only a slight possibility that the impact could be erased by "traditional remedies" to ensure a fair election rerun; and whether on balance the employee sentiment in the pre-election cards would be better protected by a bargaining order.[7] Consequently, we remand the case for the proper analysis of the causal connection between the unfair labor practices and the conclusion that the election process was undermined.[8] Upon remand, the record alone should be the basis of the Board's "proper findings." The Board may determine, for example, whether Kutas, Barton, and Gibson, the three most active employees in Union drives, were likely to have been influenced by the threats;[9] whether the three had a timely opportunity to spread the harmful influence among other employees; what effect, other than turnover, the time span between the threats and the bargaining order might have upon elimi-

7. The "precise analysis" which the Court in *Gissel* thought was missing from the record, to justify the bargaining order, and for which the Court remanded for the Board's "proper findings," is the following:

In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight, and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue (see n. 32, *supra*).
395 U.S. at 614–615, 89 S.Ct. at 1940.

8. Ordinarily, it is not for the courts to make the analysis. The *Gissel* Court, in discussing whether a cease and desist order or a bargaining order was the proper remedy for eliminating the consequences of an unfair labor practice, stated:

It is for the Board and not the courts * * * to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act * * *, the Board draws on a fund of knowledge and expertise all its own, and its choice of a remedy must therefore be given special respect by reviewing courts.
395 U.S. at 612, n. 32, 89 S.Ct. at 1939.

9. *See* Fremont Newspapers, Inc. v. N. L. R. B., 436 F.2d 665 (8th Cir. filed Dec. 22, 1970).

nation of the impact; and whether the Company's unlawful conduct might probably recur if an election were held.

We deny the petition to review, retain jurisdiction, defer ruling upon the validity of the *bargaining* order and remand with direction to the Board to reconsider the record for the sole purpose of making the requisite *Gissel* findings and appropriate conclusions; and to certify to this court the findings made and conclusions drawn.

Petition to review denied, jurisdiction retained, remanded for further proceedings.