**AUTOMATED BUSINESS SYSTEMS, a Division of Litton Business Systems, Inc., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 73–1831.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 31, 1974.

Decided May 23, 1974.

Louis .A. Cappadona, Jr., Beverly Hills, Cal., for petitioner.

Jonathan G. Axelrod, Asst. Gen. Counsel for Special Litigation, N L R B; Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Abigail Cooley, Asst. Gen. Counsel for Special Litigation, N L R B, Washington, D. C., on brief.

Winn Newman, Ruth Weyand, Boren Chertkov, Washington, D. C. on brief, for intervenor.

Before EDWARDS, CELEBREZZE and ENGEL, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is a petition for review and cross-application for enforcement of an order of the NLRB ordering petitioner to cease and desist its unfair labor practices and to bargain with the union. The Board found that the company's violations of § 8(a)(1), of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), invalidated an election which had rejected the union and that they precluded the holding of a fair rerun election.

In October 1969, the company and the union entered into a collective bargaining agreement. In May 1971, about five months before the expiration date of the contract, certain employees distributed handbills at the plant to indicate their dissatisfaction with the union. The union filed charges with the Board, alleging that the company had unlawfully assisted these employees, and a complaint was issued on July 16. Three days later, the employees filed a petition with the Board, pursuant to § 9(c)(1)(A) of the Act, asserting that the union was no longer the representative of a majority of unit employees and requesting that a decertification election be conducted.

On July 1, the union requested the company to negotiate a new agreement. On July 29, the company replied that it would not negotiate because it had a reasonable doubt as to the union's majority status. Also on that date, the Regional Director dismissed the petition to decertify the union on the ground that the complaint which had issued against the company on July 16 raised serious questions concerning the employees' ability to vote their free choices in the contemplated election. Shortly thereafter, the union filed another charge, alleging that the company was unlawfully refusing to bargain.

An appeal was taken from the Regional Director's dismissal of the decertification petition. The employees also filed charges with the Board alleging that the company had favored the incumbent union, and advised the company that any bargaining which it conducted with the union would amount to an unfair labor practice. A few weeks later the em-

ployees' attorney notified the company that the decertification petition filed with the Board's Regional Office had been supported by "71 cards . . . representing a majority of those employed in the unit." Later, an employee told a company vice-president that there were more than 80 "cards" on file with the Board.

On September 20, a complaint issued alleging that the company had unlawfully refused to bargain with the union. Three days later, the union again requested contract negotiations, and attached to its request a supporting petition purportedly signed by over 90 unit employees. The company never responded to this request. On September 28, the company wrote each employee stating that the decertification petition had been "blocked" by the union's charges, that the charges were groundless, that resolution of the charges would require "a trial and perhaps lengthy appeals," and that until their resolution, "your company cannot recognize the Union." The letter further stated that the various claims of majority support could best be decided in a secret ballot election, that the company would "settle the charges against it" to expedite an election, and that the union would not fear an election if it represented a majority of the employees. That day, the Board upheld the dismissal of the decertification petition because of the outstanding unfair labor practice complaints.

The collective bargaining agreement expired on September 30. The unfair labor practice complaints were consolidated for hearing and went to trial on October 13. After evidence was taken for several days, the matter was adjourned and the parties reached a settlement by which all the charges were withdrawn, the union filed a petition for certification, and the company agreed to a Stipulation for Certification Upon Consent Election.

On January 10, nine days before the scheduled election, the company distributed an updated version of its employee manual to all employees. The manual related the history and other information concerning the company, and set forth in general terms the working conditions of the plant, including such matters as employment benefits, parking facilities and lost and found arrangements. On the last page of the booklet appeared a notation that "the contents are presented as a matter of information only and are not to be understood as a contract between the Company and its employees . . . The company reserves the right to change, suspend or cancel all or any part of them as circumstances may require."

Some employees expressed concern about the possibility of reduced benefits. Therefore, on January 11, the plant manager distributed a memorandum explaining that the offending paragraph had been included by mistake. The memorandum emphasized that company employees at another plant, who had voted to decertify their union, not only suffered "no loss whatever, but actually gained over what they had with the union." It also asserted that changes would be made from time to time to add new benefits or improve existing benefits as the need arose, and that the employees would be better off without a union contract because "the company can change benefits immediately as the need arises, rather than be restricted by a union contract that has the employees locked in until its expiration date, which might be as much as four (4) years off in the future." In conclusion, the memorandum assured the employees that they would suffer "no loss whatever by voting out the union."

Several days before the election, general foreman, William Renn approached William Chambers' work bench, discussed the election, and said that "everyone was staying with Archie [McDougall, the plant manager]." Renn commented, "I hope you know which way to go," and then added that in his opinion the employees really had no choice because "If you don't vote with the company to do away with the union they will probably move down to Damas-

cus, [Virginia]." Renn also complained that he would not welcome the Union because he (Renn) would be transferred to Damascus. About the same time, Renn approached the work area shared by Vera Tisko and Arnold Wonder. Renn told Wonder that if the union came into the plant Wonder would be transferred to Bristol, Virginia, or Fall River, Massachusetts, because the product on which he was working would be transferred there. Wonder inquired where Tisko would be transferred and Renn said he did not know.

Plant manager McDougall addressed departmental groups of employees on at least two occasions before the election. In the course of his remarks, McDougall stated that if the union won the election, the Mag-Ledger—a major production item on which a large number of employees worked—would no longer be produced in the plant; that he could not promise the Mag-Ledger would stay in Clifton if the union prevailed in the election; and that he did not know what would happen to the Mag-Ledger if the union won the election. McDougall's talks raised more questions. Employees Marie Markitto and Norma Piccolo stopped manufacturing manager, Ross Vandevander, and asked whether the Company planned to move. Vandevander replied that he was in on the planning and that if the union prevailed in the January 19 election, the plant would move out on January 20.

The day before the election, Renn approached Joseph Jagacinski and told him that the plant was not the world's worst place to work, that Jagacinski was not a young man any more, that he would have a problem finding a job elsewhere and that he should vote the union out. Renn further informed Jagacinski that if the employees voted the union in, the company would move out and the employees would be out of jobs. At noon on election day, Renn approached Frank Taddeo and advised him to "wise up" and vote no in the election. Renn added the alternative that the plant would close down, that Taddeo's job would go out

the window but that the company would take care of Renn by transferring him to its plant in Virginia.

The election resulted in a vote of 110 to 84 against the union. The union filed timely objections to conduct affecting the election, and filed unfair labor practice charges predicated on substantially the same conduct and alleging, in addition, a refusal to bargain in violation of Section 8(a)(5) and (1) of the Act.

On the foregoing facts, the Board found that the company did not violate Section 8(a)(5) and (1) of the Act by withdrawing recognition from the union. However, the Board adopted the finding of the Administrative Law Judge that the company violated Section 8(a)(1) of the Act by threatening to close the plant or to reduce production if employees voted for the union, and by promising to retain existing benefits or grant additional benefits if employees rejected the union. The Board ordered the company to cease and desist from the unfair labor practices found and from in any other manner interfering with or coercing its employees in the exercise of their rights guaranteed by Section 7 of the Act. Affirmatively, the Board ordered the election set aside, dismissed the election petition, and, with two members dissenting, directed the company to recognize and bargain collectively, upon request, with the union, and to post appropriate notices.

■■ We find that the record contains substantial evidence to support the Board's determination that the company engaged in unfair labor practices prior to the election. And we find that the Board could properly conclude that these violations required that the election be set aside. The question is whether the Board was correct in ordering the company to bargain with the union, or whether the issuance of a cease and desist order would have sufficed. Initially, then, we must look to the standard which is used to determine whether a bargaining order should issue. The Board found that the situation here was

analogous to that in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Admittedly, this is not an original organization situation as in *Gissel*, but we think the guidelines established in *Gissel* can be applied to the present situation.[1] In *Gissel*, the Supreme Court recognized three degrees of unfair labor practices. With regard to the first of these categories it was stated that the Board could issue a bargaining order

> without need of inquiry into majority status on the basis of cards or otherwise, in "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices. Such an order would be an appropriate remedy for those practices, the court noted, if they are of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had." [Citations omitted]. 395 U.S. at 613–614.

The Court then explained its decision, which involved a second category of violations:

> The only effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive prac-

tices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should re-emphasize, where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. 395 U.S. at 614.

Finally, the Court described a third situation:

> We emphasize that under the Board's remedial power there is still a third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order. There is, the Board says, no *per se* rule that the commission of any unfair practice will automatically result in a § 8(a)(5) violation and the issuance of an order to bargain. 395 U.S. at 615.

Although not specifically stated in the Board's decision, apparently the facts before the Board were considered to fall within the second category described in

---

1. We recognize that distinctions have been drawn between refusals to recognize a union and withdrawal of recognition from a union. *See* NLRB v. Frick Co., 423 F.2d 1327, 1331 n. 6 (3d Cir. 1970). We have applied the good faith test in dealing with the presumption of majority status, a test which the Board, with approval of the Court in *Gissel*, abandoned in refusal to recognize cases. The Board, however, still applies the good faith test in withdrawal of recognition cases. We think, that the guidelines for issuing a bargaining order in original organization cases can be applied to cases where recognition of a certified union has been withdrawn. A comparison of the two situations demonstrates the similarities:

| INITIAL ORGANIZATION | INCUMBENT UNION |
|---|---|
| 1) Union presents Company with cards—requests recognition | 1) Company presented with demand from union to bargain and from employees not to bargain |
| 2) Company refuses to bargain | 2) Company withdraws recognition and refuses to bargain |
| 3) Unfair labor practices committed | 3) Unfair labor practices committed |
| 4) Election held—union loses | 4) Election held—union loses |
| 5) Election invalidated by bd. because of violations by company | 5) Election invalidated by bd. because of violations by company |
| 6) Bargaining order will issue if:<br>1) Maj. status at one pt.<br>2) Fair rerun not possible | 6) Bargaining order will issue if:<br>1) Union had continuing majority<br>2) Fair rerun not possible |

*Gissel*.[2] Thus, our consideration must be whether two factors existed in the situation before us:

1) Whether at one point the union had a majority.
2) Whether the employer misconduct had the tendency to undermine majority strength and impede the election process.

■■ We look first to the question whether it was shown that, at one point in time, a majority of the employees adhered to the union.[3] Since we deal with an employer's withdrawal of recognition,

2. The Board's decision is not clear on this point. At one point in the decision it was stated:

> The situation is therefore analogous to that of the original organization cases coming under the sweep of N. L. R. B. v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547. In accordance with that decision and the many decisions we have rendered under its banner, our determination to be made here is whether, given the Union's majority status, Respondent committed unfair labor practices of a serious enough nature to warrant the imposition of a bargaining order. It becomes appropriate, therefore, to look more closely into the unfair labor practices that have been committed.

It would appear from the reference to a majority status that the Board considered the case to fall within the intermediate category of unfair labor practice which has as one element the union's majority status at some point in time. However, at a later point in its decision, the Board stated that the violations involved threats of probable plant closings and were "among the most serious and most flagrant interferences with the right of employees to decide for themselves the question of union representation." The Board then stated:

> We conclude that the instant case comes within the purview of *Sinclair,* one of the four cases involved in *Gissel Packing Co. supra,* in that the unfair labor practices committed here, in violation of Section 8(a)(1), were so coercive that a bargaining order is the only available, effective remedy for them.

There was no reference to the union's majority status here. In *Sinclair* the union had lost an election after the employer refused to bargain on the basis of signature cards. The Board found that the union had a majority of the employees when it initially demanded recognition and that the company denied recognition in order to gain time to dissipate the union's strength. The Board also found:

> that the employer's threats of reprisal were so coercive that, even in the absence of a § 8(a)(5) violation, a bargaining order would have been necessary to repair the unlawful effect of those threats. The

Board therefore did not have to make the determination called for in the intermediate situation above that the risks that a fair rerun election might not be possible were too great to disregard the desires of the employees already expressed through the cards. *Gissel,* 395 U.S. at 615.

Since in the case before us, the Board devotes a substantial portion of its decision to a resolution of the question of the majority status of the union, we conclude that it treated the unfair labor practices as those less pervasive violations falling into the second category descibed in *Gissel* and not the outrageous and pervasive activities which warrant the issuance of a bargaining order without need of inquiry into majority status.

A further indication that this was the Board's conclusion is provided in the extent of the bargaining order issued. The Board modified the Trial Examiner's decision and directed that the employer bargain with the union in the old unit rather than the expanded unit. Recognizing that the union had never demonstrated its majority status in the expanded unit, the Board found that the employer could not be ordered to bargain in that unit. If the unfair labor practices had been those included in the "outrageous" and "pervasive" first category of *Gissel,* there would have been no need for a showing of majority status.

3. While the company and the union agreed to a settlement under which an election would be held, we cannot limit our review to the events occurring after this agreement. As the Supreme Court noted in *Gissel,*

> [u]nder the doctrine of Bernel Foam Products Co., 146 N.L.R.B. 1277 (1964), there is nothing inconsistent in the Union's filing an election petition and thereby agreeing that a question of representation exists, and then filing a refusal-to-bargain charge after the election is lost because of the employer's unfair labor practices. 395 U.S. at 615 n. 34.

Thus, our consideration of whether the union was supported by a majority of employees requires a determination of whether the union had a majority at a point either prior to or subsequent to the union-company agreement.

this question becomes whether the union had a continuing majority of the employees. Prior to the filing of the decertification petition and the unfair labor charges, of course, the company was bargaining with the union and there existed a valid agreement between the company and the union. The Board determined that the majority status of the union continued throughout the proceedings up until the time of the election. If this determination is correct, then the first element required in issuing a bargaining order has been satisfied. The Board's finding was based on its holding that the presumption of the majority status of a certified union had not been rebutted by the company.[4] The company on the other hand, contends that the presumption of the union's majority status was properly rebutted and that the burden was on the General Counsel to show that the union had the support of a majority of the employees.[5]

■ Initially, it is clear that the union, having been certified was entitled to a presumption of majority status. NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 279, n. 3, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); Brooks v. NLRB, 348 U.S. 96, 98–99, 75 S.Ct. 176, 99 L.Ed. 125 (1954); Bally Case and Cooler, Inc., of Delaware v. NLRB, 416 F.2d 902, 904–905 (6th Cir. 1969), cert. denied, 399 U.S. 910, 90 S.

Ct. 2201, 26 L.Ed.2d 562 (1970). This presumption was rebuttable, as it had been over a year since the union's certification. The point of controversy is whether the presumption was rebutted by the company, thus shifting the burden of proving majority status to the General Counsel. The company contends that since the Board found the company was justified in doubting the union's continuing majority status and therefore had acted in good faith in refusing to bargain, the presumption has been successfully rebutted. We are thus confronted with the question of whether evidence sufficient to raise an employer's good faith doubts about the union's majority status is enough to shift the burden to the General Counsel to show a continuing majority.

■■ In Bally Case and Cooler, Inc., of Delaware v. NLRB, *supra,* we said:

Absent special circumstances, a union enjoys an irrebuttable presumption of majority status for one year after its certification. Thereafter, the presumption is rebuttable, and an employer who has a reasonable basis in fact to doubt an incumbent union's majority status and who asserts that doubt in good faith may refuse to recognize and bargain with the union. 416 F.2d at 904–905.

Other Circuits have ruled likewise. Terrell Machine Co. v. NLRB, 427 F.2d

4. No evidence was introduced to show that the union had the support of a majority of employees. The Board reasoned that since the company had not rebutted the presumption of majority status, the presumption itself supported a finding of union majority and no further evidence was required.

5. In finding that the union's majority status continued throughout, however, the Board did not consider the fact that the union and the company had agreed on an expanded bargaining unit. This new unit, which added six employee classifications, was comprised of 194 employees, whereas the old unit which had previously been certified, consisted of 140 employees. Thus, the increase was substantial. This raises the question whether the union was entitled to a continuing presumption of majority status after it was agreed that the unit would be expanded.

. We think that the presumption as to the old unit did continue and could be reasserted after the election. Under Bernel Foam Products Co., 146 NLRB 1277 (1964), a union may file an election petition and then, after losing the election, file a refusal-to-bargain charge based on the employer's unfair labor practices. *See Gissel, supra,* 395 U.S. at 615 n. 34. A second question is whether a finding that the union had a majority in the old unit would be sufficient to satisfy the requirement of majority status, or whether the finding of majority status must relate to the new unit. The Board recognizes this problem in issuing its bargaining order. The order was limited to the requirement that the company bargain with the union in the old unit because "no bargaining occurred in the expanded unit and the union never had the opportunity to establish its majority status in that unit."

**270**

1088, 1090 (4th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970); Lodges 1746 and 743, International Association of Machinists and Aerospace Workers, AFL–CIO, 135 U.S. App.D.C. 53, 416 F.2d 809, 811–813 (1969), cert. denied, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1970).[6] The Board found that the Company was justified in withholding bargaining because it had a reasonably based doubt as to the continuing majority status of the union. However, it then held that "[e]stablishment of a base is for a reasonable doubt . . . is not the same as establishing by affirmative proof loss of majority". We find that once sufficient evidence has been presented to cast a doubt on the continued majority status, the burden shifts to the General Counsel "to prove that, on the critical date, the union in fact represented a majority of the employees." *Lodges 1764 and 743, supra,* 416 F.2d at 812; Allied Industrial Workers Local 289 v. NLRB, 155 U.S.App.D.C. 112, 476 F.2d 868 (1973); NLRB v. Frick Co., 423 F.2d 1327 (3d Cir. 1970). *Cf.* NLRB v. Tragniew, Inc., 470 F.2d 669, 674–675 (9th Cir. 1972). Thus, evidence sufficient to justify the company's withdrawal of bargaining is sufficient to shift the burden of proof to the General Counsel.

In NLRB v. Dayton Motels, Inc., 474 F.2d 328 (6th Cir. 1973), we followed the *Lodges 1746 and 743, supra,* holding:

In order to establish that an employer's withdrawal of recognition and refusal to bargain with an incumbent union transgresses Section 8(a)(5) of the Act, the burden of proof is upon the Board to show that the union actually represented a majority of the employees in an appropriate unit. Machinists Lodges 1746 & 743 v. NLRB, 135 U.S.App.D.C. 53, 416 F.2d 809 (1969).

Failure to prove a majority-status of the Union relieves an employer of any duty to bargain. Maphis Chapman Corp. v. NLRB, 368 F.2d 298, 303 (4th Cir. 1966). 474 F.2d at 331.

The reasoning of the Board in Stoner Rubber Co., 123 NLRB 1440 (1959), is pertinent:

After the lapse of the certification year, the certification creates only a presumption of continued majority. This presumption is rebuttable. Proof of majority is peculiarly within the special competence of the union. It may be proved by signed authorization cards, dues checkoff cards, membership lists, or any other evidentiary means. An employer can hardly prove that a union no longer represents a majority since he does not have access to the union's membership lists and direct interrogation of employees would probably be unlawful as well as of dubious validity. Accordingly, to overcome the presumption of majority the employer need only produce sufficient evidence to cast serious doubt on

---

**6.** We recently stated that the filing of a decertification petition, taken alone, is of itself insufficient justification for an employer's refusal to bargain with a union. Rogers Mfg. Co. v. NLRB, 486 F.2d 644 (6th Cir. 1973). The Board summarized the evidence which supported its finding that the company was justified in refusing to bargain:

Respondent knew that a decertification petition had been filed. In addition, it had been represented to Respondent by the petitioner's attorney and by another employee that the petition was supported by "cards" from a majority of the employees. On the other hand, the Union represented that it still had majority support, and it

sent Respondent a petition which purported to prove it. In these circumstances, Respondent could not place great reliance on the solidity of either asserted majority, but there may have been enough to justify a doubt.

We think the additional evidence that the company was told that a majority of the employees supported the decertification petition presents sufficient justification for a refusal to bargain. *See* Allied Industrial Workers, AFL–CIO Local Union No. 289 v. NLRB, 155 U.S.App.D.C. 112, 476 F.2d 868, 881 (1973). Thus, we agree with the Board's finding on this point.

the union's continued majority status. The presumption then loses its force and the General Counsel must come forward with evidence that on the re-fusal-to-bargain date the union in fact did represent a majority of employees in the appropriate unit.[7]

█ The Board would not permit the company to introduce evidence regarding the number of cards filed in support of the decertification petition.[8] Thus, the Board places the burden of proof on the employer and then denies it the means of meeting its burden. We cannot accept this procedure. Rather, we agree with member Kennedy's dissenting opin-ion:

I think this ruling was erroneous and prejudicial under the majority's view that Respondent had the burden of providing that the Union had ceased to be the majority representa-tive. In Bernel Foam type cases, the General Counsel regularly proves ma-jority by offering cards which have been filed with the Regional Offices to support the "RC" [certification] petitions. I fail to see the logic of the Administrative Law Judge and the majority holding that Respondent is

---

7. The board has characterized the *Stoner* holding as a minority rationale since only two members concurred in the quoted lan-guage. Taft Broadcasting, WDAF–TV AM–FM, 201 NLRB No. 113, was decided on the *Stoner* theory. The Board characterizes the Taft Broadcasting reliance on *Stoner* as dictum. The Board ruled that the correct rule was still that adopted in Celanese Cor-poration of America, 95 NLRB 664 (1951). In *Celanese*, the Board applied a good faith doubt test in determining whether an em-ployer was justified in refusing to bargain with the union. The Board held that a good faith doubt of the union's majority was a complete defense to § 8(a)(5) unfair labor charges, regardless of the actual majority status of the union. While the Board indi-cated that some basis in fact must exist to support the employer's doubt, the test was largely subjective. In *Stoner*, emphasis was placed on the production of evidence to cast a serious doubt on the union's majority sta-tus. This test is substantially an objective test. Since the test is objective and gov-erned by the evidence produced by the em-ployer rather than the employer's intent, there appears to be no reason for adopting a different test for rebutting the presumption of majority status than for withdrawing rec-ognition. See T. Seger, "The Majority Sta-tus of Incumbent Bargaining Representa-tives," 47 Tulane L.Rev. 961 (1973), where it is suggested that the Board look only to actual majority status of the union in deter-mining whether a § 8(a)(5) violation oc-curred by the employer's withdrawal of rec-ognition. However, a resolution of a serious doubt concerning majority status by the Board, absent some independent unfair labor practices, would be ignoring the election process as the best means of determining employee sentiment. We find the *Stoner* ra-tionale to be persuasive and to be the better rule and the one adopted by the courts. Al-lied Industrial Workers, Local 289 v. NLRB, 155 U.S.App.D.C. 112, 476 F.2d 868 (1973); NLRB v. Frick Co., 423 F.2d 1327 (3d Cir. 1970). The General Counsel is in a much better position to prove the majority status of the union than is the employer.

8. The number of cards signed by employees in support of the decertification petition has major relevance. In Allied Industrial Work-ers, Local 289 v. NLRB, 155 U.S.App.D.C. 112, 476 F.2d 868, 881 (1973), the Court said:

After its first year of certification a re-buttable presumption of the union's major-ity status exists. Unless the employer can prove that the union in fact no longer enjoys a majority, it can only overcome the presumption upon a showing of "suffi-cient evidence to cast serious doubt on the union's continued majority status." Ston-er Rubber Co., Inc., 123 N.L.R.B. 1440, 1445 (1959). The pertinent standard has been interpreted to require both a reason-able basis in fact for the doubt and good faith by the employer. *See, e. g.,* Lodges 1746 and 743, IMW v. NLRB, 135 U.S. App.D.C. 53, 416 F.2d 809, 812 (1969), cert. denied, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1969); NLRB v. Frick Co., 423 F.2d 1327, 1330 (3d Cir. 1970). The naked showing that a decertification petition has been filed, with no indication of the number of signatories or other re-lated matters, is an insufficient basis in fact for refusing to bargain since it estab-lishes no more than that the petition was supported by the requisite 30% "showing of interest." Wabana, Inc., 146 N.L.R.B. 1162, 1171 (1964).

See Rogers Mfg. Co. v. NLRB, 486 F.2d 644 (6th Cir. 1973).

not entitled to prove the number of cards (not the identity of the card signers) submitted to the Regional Office in support of the RD [decertification] petition. The general Counsel cannot argue that it was Respondent's burden to prove that the Union had lost support and simultaneously withhold the very proof that was within his possession. Moreover, while rejecting Respondent's attempt to obtain by subpoena the number of employees who supported the RD petition, the Administrative Law Judge received in evidence a letter from the Union to Respondent which had a document attached purporting to list the names of employees who favored the Union. In the vernacular, what is "sauce" for the General Counsel should be "sauce" for Respondent.

Since we have found the burden had shifted to the General Counsel and since no evidence was introduced by the General Counsel as to the union's majority status, we cannot find that it was shown that the union represented a majority of employees. Thus, the case must be remanded to the Board for a hearing on the question of the union's majority status. The burden will be on the General Counsel to show the union's majority. In this regard, we find that if the General Counsel does not introduce the number of employee signatures on the decertification petition, then the employer is entitled to do so.

■ We now look to the second factor in determining whether a bargaining order is appropriate—that is, did the company's unfair labor practices have the tendency to undermine majority strength and impede the election process. In considering this question, we are mindful of the Supreme Court's statement that the determination of a remedy is peculiarly within the province of the Board. As the Court said in *Gissel*:

> The employers argue that the Fourth Circuit correctly observed that, "in the great majority of cases, a cease and desist order with the posting of appropriate notices will eliminate any undue influences upon employees voting in the security of anonymity." NLRB v. Logan Packing Co., [4 Cir.] 386 F.2d [562] at 570. It is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203 [85 S.Ct. 398, 13 L.Ed.2d 233] (1964). "[I]t is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." Consolo v. FMC, 383 U.S. 607, 621 [86 S.Ct. 1018, 16 L.Ed.2d 131] (1966). 395 U.S. at 612 n. 32.[9]

However, the Board's determination is not immune from review where the remedy applied does not carry out the policies of the Act. Fremont Newspapers, Inc. v. NLRB, 436 F.2d 665 (8th Cir. 1970). Thus, we must look at the circumstances surrounding the issuance of the bargaining order.

■ The Board found that the company had violated § 8(a)(1) when three supervisors had threatened to either close the plant or transfer some of the production to another plant, and when promises of benefits had been made in a memorandum sent around to all employees. While the "prediction of unfa-

---

9. For a discussion of how the Board has applied the *Gissel* standards, see D. Carson, "The *Gissel* Doctrine: When a Bargaining Order Will Issue," 41 Fordham L.Rev. 85 (1972); L. Doppelt and J. Ladd, "Gissel Packing Company—The NLRB Applies the Standards", 49 Chicago-Kent L.Rev. 161; Note, "Bargaining Orders Since Gissel Packing: Time to Blow The Whistle on Gissel?" 1972 Wis.L.Rev. 1170.

vorable economic consequences resulting from unionization is not a violation of the Act," the statements must be a prediction and not a "threat on the part of the employer to visit such consequences upon the employees in the event of unionization." Surprenant Mfg. Co. v. NLRB, 341 F.2d 756 (6th Cir. 1965).

The promise of benefits violation centers around two items distributed to the employees. The first was a 25-page booklet entitled "Welcome to Litton ABS", designed for new employees. The booklet began with a short history of the company and then described the working conditions and benefits available to the employees. The benefits described included such items as vacation time, holidays, leaves of absence, sick leave, lunch periods, jury duty and other items. On the back cover of the booklet was the following statement:

In this handbook, legal words and phrases have been avoided as much as possible. The contents are presented as a matter of information only and are not to be construed as a contract between the Company and its employees. New situations develop constantly and it is to be understood that the Company reserves the right to change, suspend or cancel all or any part of them as circumstances may require.

The reference to the company's right "to change, suspend or cancel" benefits concerned the employees and the following day a letter was distributed in which the plant manager explained that the paragraph had inadvertently been left on the booklet when it was revised.[10]

10. The entire letter read as follows:
January 11, 1972
TO: ALL EMPLOYEES
NEW EMPLOYEE HANDBOOK
I have heard a number of employees express concern and a certain degree of suspicion over the contents of the last page in the employee handbook that was distributed yesterday.

Apparently, employees are concerned over the phrase which says ". . . and it is understood that the Company reserves the right to change, suspend or cancel all or any part of them as circumstances may require. . . .", and feel that without a union contract the Company can, and will, arbitrarily take away any of your benefits or rights it feels like.

I guess that, were I in your shoes, I would probably react the same way. But let's set the record straight. Last week we recognized an immediate need for an employee handbook which would spell out for all former union employees exactly what their *rights* and benefits are. In the interest of expediency, we used the format of the original Clifton handbook already in use by Clifton A.B.S. employees. We started writing and editing the new Clifton handbook last Thursday so that the outside printers could print it and assemble it over the weekend for distribution to you on Monday. The language on the last page that is causing so much concern was supposed to have been removed from the draft material that was sent to the printers, but we goofed! It shouldn't be there, and none of us who reviewed the material caught it.

There never has been, and never will be, any intent on the Company's part to take anything away, regardless of what the union is telling you. We would be totally out of our minds to even consider such action, because to do so would drive our people squarely into the union's camp. In order to maintain a good work force, such as you people, we must pay fair wages, provide benefits equal to or better than those of our competitors, and provide a good work environment. To do otherwise, or to take anything away, would destroy the teamwork and cooperation that I want to see continue here at Clifton.

You will recall the Ogden, Utah union decertification early in 1970. Those employees voted out their union, and were in exactly the same situation, insofar as the continuance in effect of their rights and benefits are concerned, as you will be when you vote the I.U.E. out of Clifton. Not only did the Ogden employees suffer no loss whatever, they actually gained over what they had with the union.

The booklet that we published and distributed is intended to be the Company's guarantee to you of fair treatment, of your rights as an employee, and of competitive wages and benefits, and it does exactly that. Furthermore, the book will be changed from time to time. As and when the need arises to add new benefits, or to improve an existing benefit, we will do so, and modify the booklet accordingly.

The letter went on to say that the company had no intention of taking anything away from the employees and that no loss would be suffered by voting out the union. There was also a statement that the employees

> are better off without a union contract because the Company can change benefits immediately as the need arises, rather than be restricted by a union contract that has the employees locked in until its expiration date, which might be as much as four (4) years off in the future.

Also, the letter referred to employees at a plant in Utah who had decertified the union and had not suffered any loss.

The threats of plant closure or transfer were found to have occurred in individual conversations involving three supervisors and about seven employees. The trial examiner found that

> Renn, [one of the supervisors] did in numerous conversations urge employees to vote against the union and made it clear that this was Respondent's view but that he also made reference to the fact that Respondent would shut down its operations in whole or in part or move the plant if the union came in.[11]

The statements of the other two supervisors were limited. The trial examiner found that one of them (Vandevander) conveyed to two employees

> the message that product lines would be moved out of the plant and that

---

> Actually, you are better off without a union contract because the Company can change benefits immediately as the need arises, rather than be restricted by a union contract that has the employees locked in until its expiration date, which might be as much as four (4) years off in future.
>
> You have my personal pledge, and the Company's guarantee from Jim Weidenman and Bob Panaro, that you will suffer no loss whatever by voting out the union, regardless of what you may be hearing from the union-pushers, there is nothing magic about a union contract.
>
> /s/ Arch McDougall
> Arch McDougall
> Plant Manager
>
> AMcD :mef

11. The trial examiner summarized the employees' testimony he found to be most probative in the following manner:

> Several employees testified to conversations with Renn relating to moving or closing the plant: Frank Taddeo testified that during the lunch hour on January 19, the day of the election, and immediately prior thereto Renn approached him at his work area and advised him to "wise up" and vote no in the election. Renn added the alternative that the place would close down, that Taddeo's job would go out the window but that the company would take care of Renn by transferring him to its plant in Virginia.
>
> William Chambers, like Frank Taddeo an employee in the tool and die department which was then under the supervision of Renn, testified to a similar conversation. Chambers stated that Renn came to his work bench a few days before the election, discussed the election and said that "everyone was staying with Archie [McDougall, the plant manager]." Renn commented "I hope you know which way to go," and then added that in his opinion the employees really had no choice because "If you don't vote with the company to do away with the union they will probably move down to Damascus." Renn also complained that he would not welcome the advent of the Union because he (Renn) would be transferred to Damascus.
>
> Employee Joseph Jagacinski—Renn was also his supervisor at that time—testified that Renn came to his work station at mid-morning on the day before the election and informed him that if the employees voted the Union in, the company would move out and the employees would be out of jobs. According to Jagacinski, Renn opened this conversation with the observation that the plant was not the world's worst place to work, that Jagacinski was not a young man any more, that he would have a problem finding a job elsewhere and that he should vote the union out.
>
> . . .
>
> Employee Vera Tisko also testified on this aspect of the case. Her testimony was that Renn came to the work station where she and employee Arnold Wonder performed their jobs. In her presence Renn told Wonder that if the Union came into the plant Wonder would be transferred to Bristol, Virginia or Fall River, Massachusetts because the product on which he was working would be transferred there. Wonder inquired where Tisko would be transferred and Renn said he did not know. (Footnotes omitted).

this would occur on January 20th if the Union won the election.

Finally, with regard to the third supervisor, the trial examiner determined that he had

> indicated to the employees that a union victory in the election would imperil the continuation of Mag-Ledger [a product involving 25–30 employees] production and that such a threat to curtail production because of a union election victory differs only in degree, not in kind, from a threat to move or close the plant.

 For the most part, the conversations seem to have taken place in a friendly atmosphere. We are cognizant, of course, that the trial examiner was in a better position to judge the circumstances surrounding the remarks. Our concern centers around the denial of the company's offer of proof that the remarks did not influence the employees to whom they were directed. The Board states that such evidence is not relevant. We disagree. The Supreme Court, in *Gissel*, identified some factors to be considered by the Board in making its decision:

> In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likeli-

hood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue. 395 U.S. at 614–615.

In our view there do not appear to have been a large number of unfair labor violations by the company. The limited nature of the activities makes it difficult to say that the employees' testimony would not have some bearing on the determination of the impact of the § 8(a)(1) violations, NLRB v. Bell Mfg. Div., Di Giorgio Leisure Products, Inc., 483 F.2d 150 (9th Cir. 1973). The use of a bargaining order assumes that "the employer's unfair labor practices substantially weakened the employees' adherence to their union." Fremont Newspapers, Inc. v. NLRB, 436 F.2d 665, 673 (8th Cir. 1970). We find that under the circumstances of this case the absence of this testimony renders it unlikely that the Board could make a "proper analysis of the causal connection between the unfair labor practices and the conclusion that the election process was undermined." New Alaska Development Corp. v. NLRB, 441 F.2d 491, 494 (7th Cir. 1971).[12] Nor do we find in

---

12. Considerations in making the analysis are The extensiveness of the company's threats and the impact of this unlawful practice upon the election; whether there is only a slight possibility that the impact could be erased by traditional remedies to ensure a fair election rerun; and whether on balance the employee sentiment in the pre-election cards would be better protected by a bargaining order. New Alaska Development Corp. v. NLRB, 441 F.2d 491, 494 (7th Cir. 1971).

Factors involved in determining the impact on the election are whether the employees were likely to have been influenced by the threats; whether they had a timely opportunity to spread the harmful influence among other employees; what effect, other than turnover, the time span between the threats and the bargaining order might have upon elimination of the impact; and whether the company's conduct might probably recur if a rerun of the election were held. New Alaska Development Corp., *supra*, 441 F.2d at 494. The Board need not consider events occurring after the issuance of the bargaining order. G. P. D., Inc. v. NLRB, 430 F.2d 963 (6th Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1193, 28 L.Ed.2d 323 (1971); NLRB v. Kostel Corp., 440 F.2d 347 (7th Cir. 1971); NLRB v. L. B. Foster Co., 418 F.2d 1 (9th Cir. 1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970). To do so would put a premium upon continued litigation by an employer. NLRB v. Drives, Inc., 440 F.2d 354 (7th Cir.), cert. denied, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971). But see NLRB v. General Stencils, Inc., 438 F.2d 894 (2d Cir. 1971); NLRB v. American Cable Sys-

the Board's decision an explanation for its order which demonstrates that it undertook this analysis. The policy of the Act to effectuate employee sentiment requires that more than mere conclusions be given. NLRB v. American Cable Systems, Inc., 427 F.2d 446 (5th Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970); NLRB v. General Stencils, Inc., 438 F.2d 894 (2d Cir. 1971).

Thus, we remand to the Board for the purpose of making the analysis discussed here. On remand the company may introduce the testimony of the employees regarding the effect of the statements. If the Board then determines that a bargaining order is appropriate, the order can be directed only, as the Board did, at the old bargaining unit, since there has been no showing of majority status in the unit.[13] Petition for review is granted, and this matter is remanded to the Board for further proceeding consistent with this opinion.

EDWARDS, Circuit Judge (concurring in part and dissenting in part).

I concur with remand of this case for further consideration by the Board, specifically to admit evidence (appropriately safeguarding individual privacy) pertaining to the cards reported to have been filed with the petition for decertification of the union. Like dissenting Board member Kennedy, I am inclined to think as to this evidence that what is "sauce" for the general counsel should be "sauce" for the respondent.

I find myself in disagreement, however, with much of the dicta in the opinion.

First, the Board's finding of an employer's good faith doubt concerning a continuing majority on the part of a previously established union does not equate a determination of an actual loss of a majority by the union. Nor do I think this court should hold that such a determination destroys the presumption of a continuing union majority. (See Brooks v. NLRB, 348 U.S. 96, 98–99, 75 S.Ct. 176, 99 L.Ed. 125 (1954)). The presumption should be overborne only by establishment of an objective basis in fact for believing that the union had lost the majority. The respondent certainly is entitled to present competent evidence bearing on this issue, but until respondent has established a prima facie case on the union's loss of majority, the presumption should still be effective.

Second, I know of no more coercive measures which may be taken by a company in an NLRB election than to circulate plant closing threats. Talk of the transfer of operations or the closing of the plant represents an immediate threat to the job, and the actual livelihood of the employees. This sort of threat should not be minimized.

I also disagree with the suggestion that evidence concerning the impact of the threats upon the persons who testified that they heard them is a significant consideration. The mere fact that in the aftermath of this sort of labor-management controversy an employee

---

tems, Inc., 427 F.2d 446 (5th Cir.) cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970); General Steel Products, Inc. v. NLRB, 445 F.2d 1350, 1356 (4th Cir. 1971), for the opposite result. Also see Note, "The NLRB Must Consider Events Subsequent to the Initial Unfair Labor Practice Hearing in Determining the Possibility of a Fair Rerun of the Certification Election," 9 Houston L.Rev. 358 (1972).

We are again confronted with the ambiguity of the Board's order. The Board, in comparing the case to *Sinclair*, one of the cases in *Gissel*, said that "the unfair labor practices committed here, in violation of Section 8(a)(1), were so coercive that a

bargaining order is the only available, effective remedy for them." The Board made no finding of a § 8(a)(5) violation. If the Board had determined that it was unnecessary to make the analysis called for in the second category of unfair labor practice, neither would it have been necessary to make its finding with regard to the union's majority status. See note 2, *supra*.

13. If, on remand a bargaining order is issued, or if a rerun of the election is to be held, the union and the company can then deal with the question of an expanded bargaining unit.

would testify at all against his employer is indicative that the threats had not changed his mind. But that fact has no relationship to what the Board might find about the coercive effect of the threats on the total employee group.

The Board found that the plant manager, the manufacturing manager and the general foreman of the plant all participated in warning respondent's employees that if the union won the election, the plant would move or close. Such threats would run like wildfire through a small manufacturing plant. The employees most affected would be the very ones who subsequently would not dare to testify.